219 P.3d 1111

**OFFICE OF HAWAIIAN AFFAIRS, Rowena Akana, Haunani Apoliona, Dante Carpenter, Donald Cataluna, Linda Dela Cruz, Colette Machado, Boyd P. Mossman, Oswald Stender, And John Waiheʻe, IV, in their official capacities as members of the Board of Trustees of the Office of Hawaiian Affairs, Pia Thomas Aluli, Jonathan Kamakawiwoʻole Osorio, Charles Kaʻaiʻai, and Keoki Maka Kamaka Kiʻili, Plaintiffs–Appellants,**

v.

**HOUSING AND COMMUNITY DEVELOPMENT CORPORATION OF HAWAIʻI (HCDCH), Robert J. Hall, in his capacity as Acting Executive Director of HCDCH, Charles Sted, Chair, Stephanie Aveiro, Francis L. Jung, Charles King, Lillian B. Koller, Betty Lou Larson,**

Theodore E. Liu, Travis Thompson, Taiaopo, Tuimaleialiifano, Members of the Board of Directors of HCDCH, State of Hawai'i, and Linda Lingle, in her capacity as Governor, State of Hawai'i, Defendants–Appellees.

No. 25570.

Supreme Court of Hawai'i.

Oct. 27, 2009.

As Amended Nov. 24, 2009.

326

Yuklin Aluli, Kailua, Richard Naiwieha Wurdeman, Mililani B. Trask, and Dexter K. Kaiama, for plaintiff-appellant Osorio.

Mark J. Bennett, Attorney General, and William J. Wynhoff and Kimberly Tsumoto

Guidry, Deputy Attorneys General, for defendants-appellees State.

MOON, C.J., NAKAYAMA, ACOBA, and RECKTENWALD, JJ.; and Circuit Judge CHAN, In Place of DUFFY, J., Recused.

Opinion of the Court by MOON, C.J.

On July 15, 2009, defendants-appellees State of Hawai'i (State), the Housing and Community Development Corporation of Hawai'i (HCDCH) and its executive director and board of directors, as well as Linda Lingle, in her capacity as Governor of the State [hereinafter, collectively, the State] filed a motion to dismiss the claims of plaintiff-appellant Jonathan Kamakawiwo'ole Osorio (who is the only remaining plaintiff-appellant in the above-captioned case,[1] which was remanded from the United States Supreme Court on May 4, 2009), contending, *inter alia*, that Osorio's claims "are not justiciable" inasmuch as: (1) he lacks standing to pursue the instant case; (2) the case is no longer ripe for adjudication; and (3) Osorio seeks an impermissible advisory opinion.[2] At the outset, we observe that the State's arguments set forth in its motion, discussed more fully *infra*, focus on the justiciability of Osorio's *claims*, not merely his *appeal*. However, were we to grant the State's requested relief, *i.e.*, grant its motion to dismiss, we would effectively be dismissing Osorio's *appeal* and, thereby divest this court of jurisdiction to address the substance of the arguments presented therein, *i.e.*, the justiciability of Osorio's *claims*—a result that the State presumably could not have intended. We, therefore, deny the State's motion to dismiss Osorio's appeal and retain jurisdiction over this case. In so doing, we are mindful of our duty to

1. On July 15, 2009, plaintiffs-appellants Office of Hawaiian Affairs (OHA) and its board of Trustees [hereinafter, collectively, the OHA plaintiffs], Pia Thomas Aluli, Charles Ka'ai'ai, and Keoki Maka Kamaka Ki'ili [hereinafter, collectively, the individual plaintiffs and, together with the OHA plaintiffs, collectively, the plaintiffs] filed a motion, seeking dismissal of their appeal, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 42(b) (2009), quoted *infra*, based on a settlement with the State, discussed below. The motion was filed jointly with the State. An order granting the joint motion is being filed simultaneously with this opinion, leaving Osorio as the

only remaining plaintiff whose claims are the subject of this opinion.

2. On July 21, 2009, this court granted a request for an *extension of time filed by Osorio*, but limited Osorio's response to the above "threshold" issues, stating that, "in the event Osorio prevails on the threshold issues, he will be allowed to file a supplemental memorandum in opposition, addressing the remaining substantive issues raised by the State in its motion to dismiss."

consider, *sua sponte*, jurisdictional issues such as standing and ripeness. *Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court*, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (holding that "although neither the parties nor the trial court considered the question of standing, this court has a duty, *sua sponte*," to determine whether the plaintiff has standing (citations omitted)); *see also Kapuwai v. City & County of Honolulu*, 121 Hawai'i 33, 39, 211 P.3d 750, 756 (2009) (holding that "[i]t is axiomatic that ripeness is an issue of subject matter jurisdiction"). Accordingly, inasmuch as the parties have "briefed" the issues of standing and ripeness in their memoranda in support of, and in opposition to, the motion, we address the justiciability of Osorio's *claims*, *i.e.*, whether (1) Osorio has standing to prosecute his complaint against the State, (2) the case remains ripe for adjudication; and/or (3) Osorio seeks an impermissible advisory opinion.

In his memorandum in opposition to the State's motion, filed August 5, 2009, Osorio argues, *inter alia*, that he: (1) "has standing to proceed in this matter as a Hawaiian"; (2) raises claims and issues that are ripe; and (3) does not seek an impermissible advisory opinion. On August 14, 2009, the State, with the permission of this court, filed a reply to Osorio's memorandum in opposition, essentially providing further support for the threshold issues of justiciability that it had raised originally in its motion.

Based on the discussion below, we hold that (1) Osorio has standing in this case, but (2) his asserted claims are not ripe for adjudication. Thus, we vacate the circuit court's January 31, 2003 judgment and remand the case for entry of a judgment dismissing Osorio's claims against the State without prejudice.

## I. *BACKGROUND*

As this court stated in *Office of Hawaiian Affairs v. Housing and Community Development Corp. of Hawai'i* [hereinafter, *OHA v. HCDCH* ], 117 Hawai'i 174, 177 P.3d 884 (2008):

[T]he instant action arises from the [State's] efforts in the mid–1990s to transfer certain parcels of ceded lands to private entrepreneurs for the purpose of residential development. On August 11, 1995, the plaintiffs [ (including Osorio) ] filed suit, seeking an injunction against the [State] from selling or otherwise transferring to third parties two specific parcels of ceded lands located on the islands of Maui and Hawai'i, as well as any ceded lands from the public lands trust. Alternatively, the plaintiffs [ (including Osorio) ] sought a declaration that the State was not authorized to alienate ceded lands from the public lands trust or, if the trial court ruled the State was so authorized, a declaration that . . . such alienation would not limit the claims of native Hawaiians to the ceded lands.

On December 5, 2002, the trial court ruled in favor of the [State], concluding that the plaintiffs' [including Osorio's] claims were barred by the doctrines of: (1) sovereign immunity; (2) waiver and estoppel; and (3) justiciability-specifically, political question, ripeness, and the mandate against advisory opinions. Nevertheless, the trial court also concluded that the State had the express authority to alienate ceded lands from the public lands trust. [A Hawai'i Rules of Civil Procedure (HRCP) ] Rule 54(b) [ (2007) ] judgment was, thereafter, entered on January 31, 2003, and the plaintiffs [ (including Osorio) ] appealed.

117 Hawai'i at 180–81, 177 P.3d at 890–91 (footnote omitted).

On appeal before this court, the plaintiffs (including Osorio) challenged the aforementioned determinations made by the trial court. *Id.* at 181, 177 P.3d at 891. We reversed the trial court's judgment, holding, *inter alia*, that: (1) the Joint Resolution to Acknowledge the 100th Anniversary of the January 17, 1893 Overthrow of the Kingdom of Hawaii [hereinafter, the Apology Resolution], which was signed into law by then-President Bill Clinton on November 23, 1993 as Public Law No. 103–150, 107 Stat. 1510 (1993),[3] gave rise to a fiduciary duty on the

---

**3.** For the full text of the Apology Resolution, *see OHA v. HCDCH*, 117 Hawai'i at 183–86, 177 P.3d at 893–96.

part of the State—as trustee of the ceded lands—to preserve the corpus of the public lands trust until "such time as the unrelinquished claims of native Hawaiians have been resolved"; (2) the plaintiffs' (including Osorio's) claims were not barred by the doctrine of sovereign immunity; (3) the claims were ripe; and (4) the action did not present a nonjusticiable political question. *Id.* at 197–210, 217, 177 P.3d at 907–21, 927. Accordingly, we

> remand[ed] th[e] case to the circuit court with instructions to issue an order granting the plaintiffs' [ (including Osorio's) ] request for an injunction against the [the State] from selling or otherwise transferring to third parties (1) the parcel of ceded land on Maui [ (the Leialiʻi parcel) ] and (2) any ceded lands from the public lands trust until the claims of the native Hawaiians to the ceded lands has been resolved.

*Id.* at 181, 177 P.3d at 891.

Thereafter, the State petitioned the United States Supreme Court for a writ of certiorari and, on October 1, 2008, the Court granted the State's petition. Oral argument was held before the Court on February 25, 2009. On March 31, 2009, the Court issued its decision in *Hawaiʻi v. Office of Hawaiian Affairs*, — U.S. ——, 129 S.Ct. 1436, 1445, 173 L.Ed.2d 333 (2009), wherein it held that the Apology Resolution could not be read to "create a retroactive 'cloud' on the title [of the ceded lands] that Congress granted to the State of Hawaiʻi in 1959." —— U.S. at ——, 129 S.Ct. at 1445. However, the Court stated that it "ha[d] no authority to decide questions of Hawaiian [*i.e.*, state] law or to provide redress for past wrongs except as provided for by federal law." *Id.* Accordingly, the Court reversed the judgment of this court and remanded the case "for further proceedings not inconsistent with [its] opinion." *Id.*

The plaintiffs (excluding Osorio) and the State [hereinafter, collectively, the parties] forwarded a joint letter to this court on May 4, 2009, advising that "the parties [ (except Osorio) had] reached a tentative settlement contingent upon S.B. 1677, C.D. 1, [4] becoming law." In response thereto, on May 15, 2009, we ordered that the parties and Osorio "shall inform this court as soon as possible, but no later than July 17, 2009, whether there is any effective settlement in this matter, and, if so, whether any claims remain in this case." In accordance with this court's May 15, 2009 order, the parties filed a joint motion, on July 15, 2009, seeking dismissal of the plaintiffs' (excluding Osorio's) appeal, pursuant to HRAP Rule 42(b),[5] inasmuch as S.B. 1667 had become law, and, thus, the settlement agreement between the parties was final. *See supra* note 1.

## II. DISCUSSION

### A. Standing

#### 1. The State's and Osorio's Arguments

The State argues that this court should dismiss Osorio's remaining claims because he lacks standing to "advance any claims on behalf of native Hawaiians or to assert any injury to or breach of any duty owed to native Hawaiians." More specifically, the State argues that Osorio does not have standing as he is not a beneficiary of the section 5(f) trust of the Admission Act, quoted below, because he has not alleged that he is a "descendant of *not less than one-half part* of the blood of the races inhabiting the Hawaiian Islands previous to 1778."

Section 5(f) of the Admission Act provides in relevant part that:

> The lands granted to the State of Hawaii by subsection (b) of this section and public

4. S.B. 1667, discussed more fully *infra*, essentially proposed that a two-thirds majority vote of the legislature would be required before a state agency would be permitted to sell or give away ceded lands and, additionally, notice to OHA would be required. The bill was signed into law as Act 176 by Governor Lingle on July 13, 2009.

5. HRAP Rule 42(b) states that:

> If the parties to a docketed appeal or other proceeding sign and file a stipulation for dismissal, specifying the terms as to payment of costs, and pay whatever fees are due, the case shall be dismissed upon approval of the appellate court, but no mandate or other process shall issue without an order of the court. Upon motion and notice, the appellate court may dismiss the appeal upon terms fixed by the appellate court.

lands retained by the United States under subsections (c) and (d) and later conveyed to the State under subsection (e), together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust [ (1) ] for the support of the public schools and [ (2) ] other public educational institutions, [ (3) ] *for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act [ (HHCA) ], 1920, as amended,* [ (4) ] for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and [ (5) ] for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States.

(Emphasis added.) In turn, the HHCA defines the term "native Hawaiian" as "any descendant of *not less than one-half part* of the blood of the races inhabiting the Hawaiian Islands previous to 1778." HRS § 2–201 (1993) (emphasis added).

The State asserts that the first amended complaint in this case alleges that Osorio is a "Hawaiian," as defined in HRS § 10–2 (Supp. 2008), *i.e.,* a "descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawai'i"; it does *not* allege that Osorio is a "native Hawaiian." Thus, the State sub-

mits that Osorio is not a beneficiary of the section 5(f) trust. The State contends that, inasmuch as Osorio has not alleged that he is a "native Hawaiian" trust beneficiary, "he lacks standing to assert a claim based on any claimed right of or duties owed to native Hawaiians, as the 'general rule is that the doctrine of standing prohibits a litigant from asserting another's legal right.'" (Citing *Akinaka v. Disciplinary Bd.,* 91 Hawai'i 51, 58, 979 P.2d 1077, 1084 (1999)) (other citations omitted). The State further argues that "Osorio also lacks standing because he, as a non-native Hawaiian, is not injured in fact by the sale of land allegedly in breach of a duty to native Hawaiians."

Osorio responds, *inter alia,* that he has standing to proceed in the instant case because "[i]t is uncontroverted that Osorio is a Hawaiian, descended from the 'races of people inhabiting the Hawaiian islands prior to 1778.' As such he possesses certain rights that are separate and distinct from the rights of other citizens of Hawai'i who are neither native Hawaiians nor Hawaiians." (Citing *Pele Defense Fund v. Paty [hereinafter, PDF ],* 73 Hawai'i 578, 598 n. 15, 837 P.2d 1247, 1260 n. 15 (1992)) (other internal citations omitted). Osorio asserts that:

[Such] rights are codified in three distinct legal sources ( [a]rticle XII of the Hawai'i Constitution, [discussed *infra,* HRS] § 7–1 [ (1993),[6] and [HRS] § 1–1 [ (1993) [7] ] ), but derive from ancient Hawaiian custom and usages. These rights may be asserted by any Hawaiian, regardless of blood quantum. [*PASH,* 79 Hawai'i] at 449, 903 P.2d at 1270. The existence of these rights are coterminous with the [court]'s understanding that claims based on practiced custom

---

6. HRS § 7–1 states:

 Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided that this shall not be applicable to wells

and watercourses, which individuals have made for their own use.

7. HRS § 1–1 provides that:

 The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.

raise[ ] different issues than those premised on mere land ownership. *Id.* at 439, 903 P.2d at [1260]. Furthermore, the western concept of exclusivity is not universally applicable in Hawai'i. *Id.* at 447, 903 P.2d at 1268.

To the extent that the public trust lands of Hawai'i are alienated or otherwise transferred before there is a resolution of the claims of [n]ative Hawaiians ... Osorio's rights as a Hawaiian in those lands are abridged. Osorio continues to have "unrelinquished claims," characterized as political claims in this litigation, claims that date back to his native Hawaiian ancestors in 1893, which remain as yet unresolved through the political process. In addition, Osorio suffers the same harm and injury with respect to the alienation of land that was discussed by [David H. Getches, a professor at the University of Colorado School of Law [8]] and ["kuma hula" Olive] Kanahele [9] in the trial on this matter and cited by this ... [c]ourt in its earlier opinion. Such injury and harm is inflicted on Hawaiians and native Hawaiians alike.

Osorio—citing article XII, section 4 of the Hawai'i Constitution [10]—additionally claims that standing is conferred on him because of the public interest in the rights of Hawaiians. More specifically, he argues that, "as a Hawaiian and a member of the public," he

has a direct interest in the sale or disposition of the lands of the ceded land[s] trust because his right and ability to practice his culture and traditions spring from the land. Whenever ceded lands are alienated from the trust, the trust res is permanently diminished, and the collective rights of the public, Hawaiians, and native Hawaiians are negatively impacted.

Although acknowledging that such injury is a "generalized injury" suffered by the public at large, Osorio states that he "suffers addition-

al cultural injuries because he is indigenous and his identity and cultural subsistence and religious rights are intrinsically tied to the land." Further, Osorio argues that this court "has consistently lowered standing barriers in cases of public interest." (Citing *In re Banning*, 73 Haw. 297, 312–13, 832 P.2d 724, 732–33 (1992); *Akau v. Olohana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982); *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 623 P.2d 431 (1981)).

In its reply, the State specifically responds to each of Osorio's arguments as follows. First, the State contends that Osorio,

who cannot argue that he (or any other Hawaiian) is a *native Hawaiian* beneficiary of the [section] 5(f) trust, is limited to arguing that, as a *Hawaiian,* he has standing to pursue [section] 5(f) claims on behalf of *native Hawaiian* beneficiaries. There is no case recognizing a Hawaiian individual's standing to litigate the interests of third party *native* Hawaiians, and, moreover, it is blatantly untrue .that "there would be no possible resolution to the claims of native Hawaiians if ... the descendants of the original inhabitants of these islands were not allowed access to the highest court of Hawai'i." Thousands of native Hawaiians including plaintiffs who *were* parties to this lawsuit, have access to the courts to pursue their claims.

(Emphases in original.) (Internal citation and footnotes omitted). Thus, the State argues that "this court's recognition of [Osorio]'s 'standing' would effectively create a new class of individuals who are entitled to litigate [section] 5(f) on behalf of native Hawaiian trust beneficiaries in contravention of this court's established standing doctrine." (Original emphasis omitted.)

Next, the State contends that Osorio "is not arguing that he has standing to challenge

---

8. For a discussion of Getches' testimony, *see* OHA v. HCDCH, 117 Hawai'i at 214–15, 177 P.3d at 924–25.

9. For a discussion of Kanahele's testimony, *see* OHA v. HCDCH, 117 Hawai'i at 215, 177 P.3d at 925.

10. Article XII, section 4 provides that:

The lands granted to the State of Hawai'i by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as "available lands" by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, *shall be held by the State as a public trust for native Hawaiians and the general public.* (Emphasis added.)

the State's now hypothetical sale of [section] 5(f) trust lands as a *public* beneficiary of the trust.... To the contrary, he expressly alleges that his rights, as a *Hawaiian,* are 'separate and distinct from those of the general public.'" (Emphasis in original.) The State, thus, insists that Osorio's assertions that he has standing because (1) "the State's alienation of the ceded lands would 'abridge' the customary rights of any Hawaiian (though he does not claim to himself exercise [those] rights)" and (2) "the public has a 'vested and significant' interest in protecting the customary rights of native Hawaiians and their descendants" are "beyond the scope of the plaintiffs' complaint and this case, as plaintiffs have never claimed a violation of [article] XII, [section] 7 ..., or HRS § 1–1 or 7–1." Thus, the State asserts that Osorio "cannot pursue [section] 5(f) claims by attempting to bootstrap the *separate* customary rights granted to Hawaiians in an attempt to manufacture standing for himself." (Emphasis in original.)

## 2. Relevant Law

 As we recently stated:

The standing doctrine ... is based on this court's prudential rules of judicial self-governance. .... Though the courts of Hawaii are not subject to a "cases or controversies" limitation like that imposed upon the federal judiciary by Article III, [Section] 2 of the United States Constitution, we nevertheless believe judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context. For "prudential rules" of judicial self-governance founded in concern about the proper and properly limited role of courts in a democratic society are always of relevant concern. And even in the absence of constitutional restrictions, courts still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government.

*Sierra Club v. Dep't of Transp.,* 115 Hawai'i 299, 319, 167 P.3d 292, 312 (2007) (internal citations and some internal quotation marks omitted) (format altered). It is well-settled in this jurisdiction "that *native Hawaiian beneficiaries* of the ceded lands trust have a 'right to bring suit under the Hawai'i Constitution to prospectively enjoin the State from violating the terms of the ceded lands trust.'" *OHA v. HCDCH,* 117 Hawai'i at 194, 177 P.3d at 904 (citing *Pele Defense Fund v. Paty,* [hereinafter, *PDF*], 73 Haw. 578, 601, 837 P.2d 1247, 1262 (1992)) (emphasis added). In *PDF,* this court addressed whether Pele Defense Fund, a non-profit corporation comprised of native Hawaiian beneficiaries of the section 5(f) trust, had standing to challenge the exchange of ceded lands in Puna on the island of Hawai'i for privately owned lands. 73 Haw. at 584–85, 591, 837 P.2d at 1253, 1256. Preliminarily, the *PDF* court stated that:

Regardless of the standing theory, the crucial inquiry is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 281, 768 P.2d 1293, 1298 (1989) (citations omitted). This court has adopted a broad view of what constitutes a "personal stake" in cases in which the rights of the public might otherwise be denied [a] hearing in a judicial forum. *Id.* at 283, 768 P.2d at 1299; *see also Akau[ v. Olohana Corp.*], 65 Haw. [383,] 387–88, 652 P.2d [1130] 1134 [ (1982) ].

In *Akau,* we held "that a member of the public has standing to sue to enforce the rights of the public generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." 65 Haw. at 388–89, 652 P.2d at 1134 (cited in *Hawaii's Thousand Friends,* 70 Haw. at 283, 768 P.2d at 1299). A plaintiff has suffered injury in fact when (1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions,

and (3) a favorable decision would likely provide relief for plaintiff's injury. *Akau,* 65 Haw. at 389, 652 P.2d at 1134–35 (citations omitted); *see also Hawaii's Thousand Friends,* 70 Haw. at 283, 768 P.2d at 1299.

73 Haw. at 592–93, 837 P.2d at 1257–58 (citations, ellipses, and internal quotation marks omitted). Additionally, the *PDF* court noted that:

The [United States Court of Appeals for the] Ninth Circuit has consistently held that native Hawaiians and native Hawaiian groups have standing to bring claims to enforce the trust provisions of the Admission Act. In *Price v. State,* 939 F.2d 702 (9th Cir.1991), *cert. denied,* 503 U.S. 938[, 112 S.Ct. 1480, 117 L.Ed.2d 622] (1992), citing its earlier opinions, the court held that "persons in the position of these appellants do have standing to challenge the use of section 5(f) lands." *Id.* at 706[, 112 S.Ct. 1480] (citations omitted).

In the 1990 case brought by Price on behalf of the Hou Hawaiians, the Ninth Circuit held that Price, a native Hawaiian, had made allegations "sufficient to show an 'injury in fact'" even though legitimate [section] 5(f) uses might not necessarily benefit native Hawaiians. *Price v. Akaka,* 928 F.2d 824, 826 (9th Cir.1990) (citations omitted), *superseding* 915 F.2d 469 (9th Cir.1990). The court continued: "In addition, allowing Price to enforce [section] 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends on the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust." *Id.* at 826–27 (citations omitted).

*PDF,* 73 Haw. at 592 n. 8, 837 P.2d at 1257 n. 8. Based on the foregoing, this court held that PDF had "alleged facts sufficient to show that it has suffered injury in fact" because:

(1) its members are beneficiaries of the public trust who [had] been economically and/or aesthetically injured by a transfer of trust lands in contravention of trust terms; (2) its injuries [were] traceable to the alleged breach of trust; and (3) the requested relief would be likely to remedy the injuries by giving beneficial use of the exchanged land to trust beneficiaries.

*Id.* at 594, 837 P.2d at 1258. The *PDF* court concluded that such holding was "consistent with this court's decisions lowering standing barriers in cases of public interest" inasmuch as:

[A] multiplicity of suits may be avoided by allowing PDF to sue to enforce the State's compliance with the [section] 5(f) trust provisions, because granting a remedy to PDF would also provide relief to its members and other trust beneficiaries. Additionally, unless members of the public and native Hawaiians, as beneficiaries of the trust, have standing, the State would be free to dispose of the trust res without the citizens of the State having any recourse. *See Kapiolani Park Preservation Soc'y v. City & County of Honolulu,* 69 Haw. 569, 572, 751 P.2d 1022, 1025 (1988) (Th[is] court held that Kapiolani Park Preservation Society, a non-profit corporation whose members included neighbors and users of the park, had standing to bring breach of trust claims under the circumstances of that case; [this court] stated that "the citizens of this State would be left without protection, or a remedy, unless we hold, as we do, that members of the public, as beneficiaries of the trust, have standing to bring the matter to the attention of the court.")

*Id.* at 592, 594–95, 837 P.2d at 1257, 1258.

Although *PDF* dealt specifically with the rights of *native Hawaiian* beneficiaries of the section 5(f) trust to assert breach of trust claims against the State, previous cases decided by this court have likewise applied a "broad view" of the "injury in fact" test to claims brought by members of the general public. For example, in *In re Banning,* this court held that the plaintiffs, who were members of the general public, had standing to bring suit "to enforce the rights of the general public" in a parcel of land. 73 Haw. at 313, 832 P.2d at 732–33.

### 3. Analysis

█ Based on the relevant law set forth above, Osorio has standing to enforce the rights of the public generally in the instant

case "*if he can show* that he has [ (1) ] suffered an injury in fact, and [ (2) ] that the concerns of a multiplicity of suits are satisfied by any means." *PDF*, 73 Haw. at 593, 837 P.2d at 1257–58 (emphasis added). The State appears to argue, as indicated above, that Osorio cannot assert his claim under article XII, section 7 *as a member of the general public* because he "is not arguing that he has standing to challenge the State's . . . sale of [section] 5(f) trust lands as a *public* beneficiary of the trust" as "he expressly alleges that his rights, as a *Hawaiian*, are 'separate and distinct from those of the general public.'" (Emphasis in original.) The State's argument mischaracterizes Osorio's position.

Throughout the pendency of this litigation, Osorio (in addition to the other plaintiffs) has consistently alleged that the State's actions in transferring ceded lands from the public lands trust violated article XII, section 7. As previously quoted, article XII, section 7 provides in relevant part that: "The lands granted to the State of Hawai'i by Section 5(b) of the Admission Act . . . shall be held by the State as a public trust *for native Hawaiians and the general public.*" (Emphasis added.) Osorio, specifically argues here that he is a "member of the public" and, thus, has a direct interest in the ceded lands held in trust for native Hawaiians and the general public. Accordingly, Osorio is *not,* contrary to the State's argument, alleging that his standing is based *solely* on the basis of his being "Hawaiian" at the exclusion of having standing as a member of the general public. In other words, because Osorio is a "Hawaiian" and may have separate and distinct statutory or constitutional rights based on his status as a "Hawaiian," such status does not exclude him as a member of the general public for the purposes of bringing suit under article XII, section 7. However, as previously indicated, the viability of Osorio's claims are contingent upon whether he can show that he has suffered an "injury in fact" and that "the concerns of a multiplicity of suits are satisfied." *PDF*, 73 Haw. at 593, 837 P.2d at 1257–58. We first turn to examine whether Osorio has suffered an "injury in fact" based upon his status as a member of the general public.

### a. "*injury in fact*" test

■ The first requirement under the "injury in fact" test is that Osorio must have "suffered an actual or threatened injury as a result of the [State]'s wrongful conduct." *Id.* Here, Osorio contends that he has suffered threatened harm from the State's breach of trust by attempting to sell or transfer the Leiali'i parcel or any of the ceded lands in general from the public lands trust. *See OHA v. HCDCH,* 117 Hawai'i at 190, 177 P.3d at 900. More specifically, Osorio alleges that, "[w]henever ceded lands are alienated from the trust, the trust res is permanently diminished, and the collective rights of the public, Hawaiians[,] and native Hawaiians are negatively impacted" and that such diminishment causes him injury as a member of the general public because, as a Hawaiian, "his identity and cultural subsistence and religious rights are intrinsically tied to the land." In *OHA v. HCDCH,* we expressly agreed with the "cultural importance of the land to native Hawaiians" set forth in the findings of the trial court, which stated that:

> The [n]ative Hawaiian [p]eople continue to be a unique and distinct people with their own language, social system, ancestral and national lands, customs, practices and institutions. "The health and well-being of the [n]ative [H]awaiian people is intrinsically tied to their deep feelings and attachment to the land." [ (Citing in a footnote to the Apology Resolution.) ] 'Aina, or land, is of crucial importance to the [n]ative Hawaiian [p]eople—to their culture, their religion, their economic self-sufficiency and their sense of personal and community well-being. 'Aina is a living and vital part of the [n]ative Hawaiian cosmology, and is irreplaceable. The natural elements—land, air, water, ocean—are interconnected and interdependent. To [n]ative Hawaiians, land is not a commodity; it is the foundation of their cultural and spiritual identity as Hawaiians. The 'aina is part of their 'ohana, and they care for it as they do for other members of their families. For them, the land and the natural environment is alive, respected, treasured, praised, and even worshiped.

117 Hawai'i at 214, 177 P.3d at 924 (original emphasis omitted) (format altered) (brackets in original). Although the trial court (like this court) used the term "native Hawaiian" in the above finding, the trial court could not have intended that its finding be limited to read that the "['a]ina, or land, is of crucial importance" to *only* those "descendant[s] *of not less than one-half part blood* of the races inhabiting the Hawaiian Islands previous to 1778." HRS § 2–201 (emphasis added). Indeed, as pointed out by Osorio, this court has never before held that Hawaiian cultural practice is limited to only those persons of fifty percent or more blood quantum. In fact, the converse is true. This court, in *PASH*, expressly stated that:

> In the context of an argument challenging the Pele Defense Fund's (PDF) standing to bring its claim, as raised on appeal in [*PDF*], we made passing reference to the circuit court's finding that PDF's membership included persons of "fifty percent or more Hawaiian blood[.]" 73 Haw. at 615 n. 28, 837 P.2d at 1269 n. 28; *see also* 73 Haw. at 620 n. 34, 837 P.2d at 1272 n. 34 (citing affidavits of persons with at least one-half native Hawaiian blood). Because the [circuit] court's relevant factual determination was not challenged on appeal, we did not disturb this finding in [*PDF*].

Nevertheless, these references in [*PDF*] were not intended to imply our endorsement of a fifty percent blood quantum requirement for claims based upon traditional or customary Hawaiian rights. The definition of the term "native Hawaiian" in the [HHCA] is not expressly applicable to other Hawaiian rights or entitlements. Furthermore, the word "native" does not appear in HRS § 1–1. Because a specific proposal to define the terms "Hawaiian" and "native Hawaiian" in the 1978 Constitutional Convention was not validly ratified, the relevant section was deleted from the 1985 version of the HRS. *See Kahalekai v. Doi*, 60 Haw. 324, 342, 590 P.2d 543, 555 (1979). Consequently, those persons who are *"descendants of native Hawaiians* who inhabited the islands prior to 1778," and who assert otherwise valid customary and traditional Hawaiian rights under HRS § 1–1, are entitled to protection regardless of their blood quantum. Haw. Const., art XII, § 7 (emphasis added). Customary and traditional rights in these islands flow from native Hawaiians' pre-existing sovereignty. The rights of their descendants do not derive from their race *per se*, and were not abolished by their inclusion within the territorial bounds of the United States. *See Organic Act*, § 83; Act of April 30, 1900, c. 339, 31 Stat. 141, 157, *reprinted in* 1 HRS 36, 74 (1985) (as amended).

79 Hawai'i at 448–49, 903 P.2d at 1269–70 (emphasis in original) (footnotes omitted) (some brackets in original). Although the State is correct that Osorio has not previously "claimed a violation of [article] XII, [section] 7 . . . , or HRS § 1–1 or 7–1," that fact is irrelevant because Osorio is *not* claiming here that he has a right to exercise certain rights to land, but simply that, as a Hawaiian member of the general public, he may suffer cultural and religious *injury* if ceded lands are transferred from the trust in violation of the State's fiduciary duties. Based on the foregoing, we conclude that Osorio, as a member of the general public and a "beneficiar[y] of the public trust," has sufficiently alleged particular and threatened injury based on his Hawaiian cultural and religious attachments to the 'aina or land. Therefore, Osorio's claims, similar to those of the plaintiff in *PDF*, satisfy the first requirement of the "injury in fact" test. *See PDF*, 73 Haw. at 594, 837 P.2d at 1258.

The second requirement of the injury in fact test, *i.e.*, that "the injury is fairly traceable to the defendant's actions," is also met. Here, Osorio's threatened cultural and religious injuries are traceable to the State's actions in alienating ceded lands from the public trust, and, "[o]nce the ceded lands are alienated from the public lands trust, they will be lost forever[.]" *OHA v. HCDCH*, 117 Hawai'i at 208, 177 P.3d at 918.

The third requirement of the "injury in fact" test is that "a favorable decision would likely provide relief for plaintiff's injury." *PDF*, 73 Haw. at 593, 837 P.2d at 1257–58. Originally, Osorio (along with the settled-plaintiffs) sought an injunction against the State from selling or otherwise transferring,

*inter alia,* the Leialiʻi parcel. If we were to, again, instruct the circuit court "to issue ... an injunction against the [State] from selling or otherwise transferring ... any ... ceded lands from the public trust until the claims of the native Hawaiians to the ceded lands [have] been resolved," *OHA v. HCDCH,* 117 Hawaiʻi at 218, 177 P.3d at 928, such decision would be "favorable" and "provide relief" to Osorio as a member of the general public. As we have previously stated, a moratorium on the alienation of ceded lands from the trust is in the interest of the general public because "*a lasting reconciliation [is] desired by all people of Hawaiʻi.*" *Id.* at 216, 177 P.3d at 926 (quoting 1997 Haw. Sess. L. Act 329 § 1 at 956) (emphasis added) (internal quotation marks omitted) (bracket in original). Thus, preservation of the status quo and of the ceded lands trust res in contemplation of "a lasting reconciliation" is in the interest of Osorio as a member of the general public.

Additionally, it is important to point out here that, as previously stated, this court, in *PDF,* cited with approval the Ninth Circuit's holding in *Price,* that

> Price, a native Hawaiian, had made allegations "sufficient to show an 'injury in fact' " even though legitimate [section] 5(f) uses might not necessarily benefit native Hawaiians. The court continued: "In addition, allowing Price to enforce [section] 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends on the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust." *Id.* at 826–27 (citations omitted).

*PDF,* 73 Haw. at 592 n. 8, 837 P.2d at 1257 n. 8. Based on the foregoing, we conclude that Osorio—as a member of the general public and a beneficiary of the public lands trust under article XII, section 7—has "made allegations sufficient to show an 'injury in fact[,]' even though legitimate [section] 5(f) uses might not necessarily benefit" members of the general public. *Id.*

### b. *concerns of a multiplicity of suits*

As previously discussed in the "Relevant Law" section *supra,* a conclusion that Osorio,

like PDF, has standing is "consistent with this court's decisions lowering standing barriers in cases of public interest" because "a multiplicity of suits may be avoided by allowing [Osorio] to sue to enforce the State's compliance with the [section] 5(f) trust provisions." *Id.* at 594, 837 P.2d at 1258. In other words, granting a remedy to Osorio "would also provide relief" to him "and *other trust beneficiaries.*" *Id.* (emphasis added). Additionally, as stated in *PDF,* "unless members of the public [ (like Osorio, who happens to be Hawaiian) ] and native Hawaiians, as beneficiaries of the trust, have standing, the State would be free to dispose of the trust res without the citizens of the State having any recourse." *Id.*

Indeed, if this court were to conclude that Osorio—as a Hawaiian, which category is not specifically delineated in article XII, section 7—does not have standing to bring suit for a breach of trust under article XII, section 7, such a conclusion would be "absurd" and contrary to this court's rules of constitutional interpretation. *In re Pioneer Mill Co.,* 53 Haw. 496, 500, 497 P.2d 549, 552 (1972) (stating that this court is "always reluctant to decide that the constitutional draftsmen intended to accomplish what appears to be an absurd result"). Such a conclusion would effectively carve out a class of citizens in this state who are *not* beneficiaries under the public land trust established pursuant to article XII, section 7. In other words, although non-Hawaiian members of the general public would be able to sue for alleged breaches of trust, as would native Hawaiians, Hawaiians, like Osorio, would be specifically excluded. Such result would, as stated above, be absurd. Thus, based on the rationale expressed by this court in *PDF,* the concerns regarding a multiplicity of lawsuits are satisfied in this case. *PDF,* 73 Haw. at 594, 837 P.2d at 1258. Accordingly, based on the foregoing, we hold Osorio has standing to pursue the claims raised in the instant case and, thus, turn next to examine the State's contention that this case is no longer ripe for decision.

### B. *Ripeness*

### 1. **The State's and Osorio's Arguments**

The State contends that:

The ripeness doctrine commands dismissal of this case, as the case is unripe no matter how the doctrine is defined. "No evidence was presented ... of any proposed sales of ceded lands other than at Leiali'i." Circuit Court Opinion at 99. Now, pursuant to Act 176, no sale of the Leiali'i lands to a third party could take place without legislative pre-approval (the non-DHHL Leiali'i lands are still owned by the State and thus covered by Act 176). Thus, any decision by this court on the merits would be judging the hypothetical legality or constitutionality of an unknown sale, of unknown land, for unknown purposes, at an unknown future time.

Inasmuch as "there now cannot be any lands sales at Leiali'i (or elsewhere) without legislative pre-approval," the State argues this case "is no longer ripe and should be dismissed."

■ In *OHA v. HCDCH,* we adopted the following test for determining ripeness:

Because ripeness is peculiarly a question of timing, the court must look at the facts as they exist today in evaluating whether the controversy before us is sufficiently concrete to warrant our intervention. *The ripeness inquiry has two prongs: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.* The fitness element requires that the issue be primarily legal, need no further factual development, and involve a final agency action. To meet the hardship requirement, a party must show that withholding judicial review would result in direct and immediate hardship and would entail more than possible financial loss.

117 Hawai'i at 207, 177 P.3d at 917 (citing *Rice v. Cayetano,* 941 F.Supp. 1529, 1538 (D.Haw.1996), *rev'd on other grounds,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000)) (emphasis added).

The State contends that, under the aforementioned ripeness test, Osorio's claims are not ripe because they do not meet either the fitness or the hardship prongs. As to the fitness prong, the State argues that "there has been no final agency or other executive branch action with regard to any proposed sale." More specifically, the State asserts that:

Neither the Leiali'i nor other ceded lands can be sold without legislative pre-approval, which obviously has not yet been provided. Thus, before the issue of whether state law would bar alienation of ceded lands would be ripe for decision, there would need to be substantial further factual development (*i.e.,* what lands, when, why, etc.) *and* legislative pre-approval. Indeed, for [this] court to act now would overstep the prudential reasons that ripeness bars exist in the first place. The court would need to prejudge the hypothetical future actions of both the executive and legislative branches before giving those branches any opportunity to act (or not act).

(Emphasis in original.)

With regard to the hardship prong, the State argues that, "[s]ince no evidence was adduced as to any land sale *other* than Leiali'i, and since Leiali'i sales *cannot* now proceed without legislative pre-approval, [Osorio] cannot show that 'withholding judicial review would result in direct and immediate hardship and would entail more than possible financial loss.'" The State further asserts that, "[i]ndeed, there is no hardship of any kind, 'direct and immediate' or otherwise. Dismissal on ripeness grounds would not bar [Osorio] or anyone else from suing if a future sale were pre-approved by the Legislature."

Osorio responds that this court "has already rejected the State's arguments that the matter was not ripe for review" and additionally contends that the legislature's enactment of Act 176 has not "had any effect on the ripeness of the instant litigation." In addressing the fitness prong, Osorio argues that "there is no need for further factual development[,] nor is there any reason[ ] for [this] court to wait for future hypothetical actions of the executive or legislative branches." In so arguing, Osorio relies extensively on this court's previous statement in *OHA v. HCDCH* that: "[t]here is no doubt that the issuance of an injunction involves a legal question," "the facts necessary to decide ripeness [were] currently before [it]," and that,

although "final agency action" with regard to the ceded lands in general ha[d not] yet [been] taken, the very nature of the plaintiffs' requested relief—that an injunction issue to protect the corpus of the public land trust until the reconciliation efforts contemplated by the Apology Resolution and related state legislation has been completed—dictate[d] that a judicial decision regarding the issuance of such an injunction [was] appropriate.

*OHA v. HCDCH*, 117 Hawai'i at 208, 177 P.3d at 918. With regard to the hardship prong, Osorio, likewise, relies on this court's earlier decision and contends simply that "this [c]ourt held that[,] '[o]nce the ceded lands are alienated from the public lands trust, they [would] be lost forever and [would] not be potentially available to satisfy the unrelinquished claims of native Hawaiians to the lands, as recognized and contemplated by ... the state legislation.'" (Citing *OHA v. HCDCH*, 117 Hawai'i at 208, 177 P.3d at 918) (brackets in original). Osorio further contends that the "harms" that this court recognized in *OHA v. HCDCH* still exist because "the alienation of ceded lands prior to the reconciliation and the settlement of native Hawaiian claims by Congress and/or the state legislature[ ] is still possible, indeed likely."

In its response, the State counters that:

[Osorio] does not even seriously attempt to demonstrate ripeness. As to the fitness prong of the ripeness test, [Osorio] makes the conclusory statement that no further factual development is necessary to allow for an injunction against all possible ceded lands alienation, but he does not explain how that is when the one sale at issue previously (Leiali'i) cannot now go forward without legislative preapproval, there was no trial evidence presented with regard to any other challenged alienation, and [Osorio] has presented no such evidence to this court.... As to the hardship prong of the ripeness test, [Osorio] offers no explanation of why dismissal without prejudice and requiring a proposed alienation *before* adjudication would cause direct and immediate hardship to *him.*

The State's arguments that Osorio's claims are not ripe center around the legislature's enactment of Act 176. Accordingly, we first examine the language and purpose of the Act.

### 2. Act 176

A joint report of the standing committees on (1) Water, Land, Agriculture, and Hawaiian Affairs and (2) Judiciary and Government Operations indicates that S.B. 1677, which became Act 176, was introduced in response to this court's decision in *OHA v. HCDCH* and the State's subsequent petition to the United States Supreme Court. *See* Sen. Stand. Comm. Rep. No. 140, *available at* http://www.capitol.hawaii.gov/session2009/CommReports. Therein, the standing committees reported

that it [was] necessary to reassert the [l]egislature's constitutional authority that it has the sole authority to resolve the ceded lands at issue on behalf of the State and to dispose of lands under the control of the State as it deems appropriate.

[The c]ommittees [found] that [the bill would] allow[ ] the [l]egislature to carry out its fiduciary responsibilities to all the people of Hawai'i, and ensure[ ] the preservation of the public land trust corpus for the benefit of the [n]ative Hawaiian people.

*Id.* Ultimately, S.B. 1677, C.D. 1 was passed by the legislature on May 5, 2009 and signed into law by Governor Lingle as Act 176 on July 13, 2009. The stated purpose of the Act is to "establish a more comprehensive process for the sale of state-owned land, and to reserve a larger oversight role of the legislature to assure that key information about certain sales or exchanges of land is shared with the legislature." 2009 Haw. Sess. Laws, Act 176, § 1. To accomplish such purposes, the Act requires the adoption of a concurrent resolution "by at least two-thirds majority vote" of each house of the legislature when the State administration sells, transfers, or exchanges ceded lands.[11] Additionally, Act

---

11. Specifically, Act 176 states that:

(a) This section applies to *all lands or interest therein owned or under the control of state*

*departments and agencies classed as government or crown lands previous to August 15, 1895,* or acquired or reserved by the government upon

176 requires that the "state department or agency proposing to sell or give any state land described in subsection (a)"

submit for introduction to the legislature a concurrent resolution for review of the proposed sale or gift. The concurrent resolution shall contain a list of all sales or gifts of state land proposed by the state department or agency. The concurrent resolution shall contain the following information:

(1) The location and area of the parcels of land to be sold or given;

(2) The appraisal value of the land to be sold or given;

(3) The names of all appraisers performing appraisals of the land to be sold or given;

(4) The date of the appraisal valuation;

(5) The purpose for which the land is being sold or given; and

(6) A detailed summary of any development plans for the land to be sold or given.

or subsequent to that date by purchase, exchange, escheat, or the exercise of the right of eminent domain, or any other manner, including accreted lands not otherwise awarded, submerged lands, and lands beneath tidal waters which are suitable for reclamation, together with reclaimed lands which have been given the status of public lands under this chapter, including:

(1) Land set aside pursuant to law for the use of the United States;

(2) Land to which the United States relinquished the absolute fee and ownership under section 91 of the Organic Act prior to the admission of Hawaiʻi as a state of the United States;

(3) Land to which the University of Hawaiʻi holds title;

(4) *Land to which the Hawaiʻi housing finance and development corporation in its corporate capacity holds title;*

(5) Land to which the department of agriculture holds title by way of foreclosure, voluntary surrender, or otherwise, to recover moneys loaned or to recover debts otherwise owed the department under chapter 167;

(6) Land that is set aside by the governor to the Aloha Tower development corporation; or land to which the Aloha Tower development corporation holds title in its corporate capacity;

(7) Land that is set aside by the governor to the agribusiness development corporation; or land to which the agribusiness development corporation in its corporate capacity holds title; and

A copy of the concurrent resolution for the prior approval of a sale or gift of land shall also be submitted to the office of Hawaiian affairs when it is submitted to the legislature.

### 3. Analysis

■ As indicated above, "[t]he ripeness inquiry has two prongs: [ (1) ] the fitness of the issues for judicial decision and [ (2) ] the hardship to the parties of withholding court consideration." *OHA v. HCDCH*, 117 Hawaiʻi at 207, 177 P.3d at 917 (citations omitted). The fitness prong "requires that the issue be primarily legal, need no further factual development, and involve a final agency action." *Id.* As indicated above, we determined in *OHA v. HCDCH* that the fitness prong had been satisfied because (1) final agency action had been taken with regard to the Leialiʻi parcel, "*i.e.,* the transfer of the parcel from DLNR to [Hawaiʻi Housing Finance and Development Corporation (HFDC) [12]]" and, (2) "although 'final agency

(8) Land to which the high technology development corporation in its corporate capacity holds title.

(b) Notwithstanding any law to the contrary, *no sale of lands described in subsection (a) in fee simple* including land sold for roads and streets, or gift of lands described in subsection (a) in fee simple to the extent such gift is otherwise permitted by law, *shall occur without the prior approval of the sale or gift by the legislature by concurrent resolution to be adopted by each house by at least a two-thirds majority vote of the members to which each house is entitled in a regular or special session* at which a concurrent resolution is submitted for approval of the sale; provided that the provisions of this section shall not apply to remnants, as that term is defined in section 171–52, or portions thereof; and provided further that this section shall not apply to the issuance of licenses, permits, easements, and leases executed in conformance with the laws applicable to the lands listed in subsection (a).

12. As noted in *OHA v. HCDCH*,

[i]n 1997, the legislature consolidated HFDC with the Hawaiʻi Housing Authority and the rental housing trust fund into the [HCDCH]. 997 Haw. Sess. L. Act 350, § 1 at 1010–11; HRS chapter 201G (2001). However, the legislature, in 2006, divided HCDCH into two separate agencies—the Hawaiʻi [HFDC] and the Hawaiʻi Public Housing Authority. *See* 2006 Haw. Sess. L. Act 180, § 2 at 709; 2007

action' with regard to the ceded lands in general [had] yet to be taken," the very nature of the plaintiffs' requested relief— that an injunction issue—dictated "that a judicial decision regarding the issuance of such an injunction [was] appropriate." 117 Hawai'i at 208, 177 P.3d at 918.

As also indicated above, Osorio essentially argues that this court should hold that the case at bar is ripe for adjudication because it previously "rejected the State's arguments that the matter was not ripe for review." Additionally, he contends that the legislature's enactment of Act 176 has not "had any effect on the ripeness of the instant litigation." We disagree with Osorio.

The legislature, in passing S.B. 1677, C.D.1, plainly indicated that the bill was a response to this court's decision in *OHA v. HCDCH* and its purpose was to "carry out its fiduciary responsibilities to all the people of Hawai'i, and ensure[ ] the preservation of the public land trust corpus for the benefit of the [n]ative Hawaiian people." Additionally, the bill—now Act 176—requires legislative approval *prior* to the alienation of any lands from the public lands trust, including (1) ceded lands, *i.e.*, lands that were "classed as government or crown lands previous to August 15, 1895," or (2) lands to which the Hawai'i housing finance and development corporation holds title, which in this case is the Leiali'i parcel. Inasmuch as no ceded lands or the Leiali'i parcel can be alienated from the public lands trust until a concurrent resolution (which has yet to be submitted by the HFDC as to the Leali'i parcel) is passed by two-thirds of the legislature, there has been no "final agency action." Thus, the "fitness prong" of the ripeness test has not been satisfied. Moreover, inasmuch as Act 176 sets forth the procedure for the legislature to carry out its fiduciary responsibilities with which this court was concerned in *OHA v. HCDCH*, judicial review at this time would be premature and, additionally, would constitute a violation of the separation-of-powers doctrine. In other words, it would be appropriate to first allow the legislature to exercise the power reserved to it in Act 176 before this court determines whether such exercise of power is or is not a violation of the State's fiduciary duties. Inasmuch as the fitness prong of the ripeness test has not been satisfied in this case, Osorio's claims are not ripe for adjudication, and it is not necessary to examine whether the hardship prong has been met.[13]

### III. *CONCLUSION*

Based on the foregoing, we hold that (1) Osorio has standing in this case, but (2) his asserted claims are not ripe for adjudication because there has been no final action by the legislature (or any agency) under Act 176 with regard to the Leiali'i parcel or any other ceded lands. Accordingly, we (1) deny the State's motion to dismiss Osorio's appeal and (2) vacate the circuit court's January 31, 2003 judgment and remand the case for entry of a judgment dismissing Osorio's claims against the State without prejudice.

---

Haw. Sess. L. Act 249, § 2 at 777–806 (codi-fied in HRS chapters 201H and 356D). Nevertheless, inasmuch as the instant action commenced prior to the aforementioned legislative changes, we continue to utilize "HFDC," as do the parties, throughout this opinion.

117 Hawai'i at 186 n.9, 177 P.3d at 896 n. 9.

**13.** .Additionally, because the instant case is no longer ripe for adjudication, it is not necessary to address the issue whether Osorio seeks an impermissible advisory opinion.