(Slip Opinion)            OCTOBER  TERM,  2008                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HAWAII ET AL. *v.* OFFICE OF HAWAIIAN AFFAIRS ET AL.

### CERTIORARI TO THE SUPREME COURT OF HAWAII

No. 07–1372.  Argued February 25, 2009—Decided March 31, 2009

After the overthrow of the Hawaiian monarchy in 1893, Congress annexed the Territory of Hawaii pursuant to the Newlands Resolution, under which Hawaii ceded to the United States the "absolute fee" and ownership of all public, government, and crown lands.  In 1959, the Admission Act made Hawaii a State, granting it "all the public lands . . . held by the United States," §5(b), and requiring these lands, "together with the proceeds from [their] sale . . . , [to] be held by [the] State as a public trust," §5(f).  Hawaii state law also authorizes the State to use or sell the ceded lands, provided the proceeds are held in trust for Hawaiian citizens.  In 1993, Congress' joint Apology Resolution "apologize[d]" for this country's role in overthrowing the Hawaiian monarchy, §1, and declared that nothing in the resolution was "intended to serve as a settlement of any claims against the United States," §3.

The "Leiali'i parcel," a Maui tract of former crown land, was ceded to the United States at annexation and has been held by the State since 1959 as part of the Admission Act §5(f) trust.  Hawaii's affordable housing agency (HFDC) received approval to remove the parcel from the trust and redevelop it upon compensating respondent Office of Hawaiian Affairs (OHA), which manages funds from the use or sale of ceded lands for the benefit of native Hawaiians.  After HFDC refused OHA's demand that the payment include a disclaimer preserving any native Hawaiian claims to lands transferred from the trust for redevelopment, respondents sued to enjoin the sale or transfer of the Leiali'i parcel and any other of the ceded lands until final determination of native Hawaiians' claims.  The state trial court entered judgment against respondents, but the Hawaiian Supreme Court vacated that ruling.  Relying on the Apology Resolution, the

court granted the injunction that respondents requested, rejecting petitioners' argument that the Admission Act and state law give the State explicit power to sell ceded lands.

*Held:*

1. This Court has jurisdiction. Respondents argue to no avail that the case does not raise a federal question because the State Supreme Court merely held that the sale of ceded lands would constitute a breach of the State's fiduciary duty to Native Hawaiians under state law. The Court has jurisdiction whenever "a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law." *Michigan* v. *Long*, 463 U. S. 1032, 1040. Far from providing a plain statement that its decision rested on state law, the state court plainly held that the decision was dictated by federal law, particularly the Apology Resolution. Pp. 6–7.

2. The Apology Resolution did not strip Hawaii of its sovereign authority to alienate the lands the United States held in absolute fee and granted to the State upon its admission to the Union. Pp. 7–12.

(a) Neither of the resolution's substantive provisions justifies the judgment below. The first such provision's six verbs—*i.e.,* Congress "acknowledge[d] the historical significance" of the monarchy's overthrow, "recognize[d] and commend[ed] efforts of reconciliation" with native Hawaiians, "apologize[d] to [them]" for the overthrow, "expresse[d] [the] commitment to acknowledge [the overthrow's] ramifications," and "urge[d] the President . . . to also acknowledge [those] ramifications," §1—are all conciliatory or precatory. This is not the kind of language Congress uses to create substantive rights, especially rights enforceable against the cosovereign States. See, *e.g.*, *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17–18. The resolution's second substantive provision, the §3 disclaimer, by its terms speaks only to those who may or may not have "claims against the United States." The State Supreme Court, however, read §3 as a congressional recognition—and preservation—of claims *against Hawaii.* There is no justification for turning an express disclaimer of claims against one sovereign into an affirmative recognition of claims against another. Pp. 8–10.

(b) The State Supreme Court's conclusion that the 37 "whereas" clauses prefacing the Apology Resolution clearly recognize native Hawaiians' "unrelinquished" claims over the ceded lands is wrong for at least three reasons. First, such "whereas" clauses cannot bear the weight that the lower court placed on them. See, *e.g., District of Columbia* v. *Heller*, 554 U. S. ___, ___, n. 3. Second, even if the clauses had some legal effect, they did not restructure Hawaii's rights and obligations, as the lower court found. "[R]epeals by implication are not favored and will not be presumed unless the intention of the leg-

islature to repeal [is] clear and manifest." *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, \_\_\_. The Apology Resolution reveals no such intention, much less a clear and manifest one. Third, because the resolution would raise grave constitutional concerns if it purported to "cloud" Hawaii's title to its sovereign lands more than three decades after the State's admission to the Union, see, *e.g., Idaho* v. *United States*, 533 U. S. 262, 280, n. 9, the Court refuses to read the nonsubstantive "whereas" clauses to create such a "cloud" retroactively, see, *e.g.*, *Clark* v. *Martinez*, 543 U. S. 371, 381–382. Pp. 10–12.

117 Haw. 174, 177 P. 3d 884, reversed and remanded.

ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–1372

HAWAII, ET AL., PETITIONERS *v.* OFFICE OF HAWAIIAN AFFAIRS ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF HAWAII

[March 31, 2009]

JUSTICE ALITO delivered the opinion of the Court.

This case presents the question whether Congress stripped the State of Hawaii of its authority to alienate its sovereign territory by passing a joint resolution to apologize for the role that the United States played in overthrowing the Hawaiian monarchy in the late 19th century. Relying on Congress' joint resolution, the Supreme Court of Hawaii permanently enjoined the State from alienating certain of its lands, pending resolution of native Hawaiians' land claims that the court described as "unrelinquished." We reverse.

I

A

In 1893, "[a] so-called Committee of Safety, a group of professionals and businessmen, with the active assistance of John Stevens, the United States Minister to Hawaii, acting with the United States Armed Forces, replaced the [Hawaiian] monarchy with a provisional government." *Rice* v. *Cayetano*, 528 U. S. 495, 504–505 (2000). "That government sought annexation by the United States," *id.*, at 505, which the United States granted, see Joint Resolution to Provide for Annexing the Hawaiian Islands to the

United States, No. 55, 30 Stat. 750 (hereinafter Newlands Resolution).  Pursuant to the Newlands Resolution, the Republic of Hawaii "cede[d] absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind" and further "cede[d] and transfer[red] to the United States the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining" (hereinafter ceded lands).[1]  *Ibid.*  The Newlands Resolution further provided that all "property and rights" in the ceded lands "are vested in the United States of America."  *Ibid.*

Two years later, Congress established a government for the Territory of Hawaii.  See Act of Apr. 30, 1900, ch. 339, 31 Stat. 141 (hereinafter Organic Act).  The Organic Act reiterated the Newlands Resolution and made clear that the new Territory consisted of the land that the United States acquired in "absolute fee" under that resolution.  See §2, *ibid.*  The Organic Act further provided:

> "[T]he portion of the public domain heretofore known as Crown land is hereby declared to have been, on [the effective date of the Newlands Resolution], and prior thereto, the property of the Hawaiian government, and to be free and clear from any trust of or concerning the same, and from all claim of any nature whatsoever, upon the rents, issues, and profits thereof.  It shall be subject to alienation and other uses as may be provided by law."  §99, *id.*, at 161; see also §91, *id.*, at 159.

--------

[1] "Crown lands" were lands formerly held by the Hawaiian monarchy. "Public" and "Government" lands were other lands held by the Hawaiian government.

In 1959, Congress admitted Hawaii to the Union. See Pub. L. 86–3, 73 Stat. 4 (hereinafter Admission Act). Under the Admission Act, with exceptions not relevant here, "the United States grant[ed] to the State of Hawaii, effective upon its admission into the Union, the United States' title to all the public lands and other public property within the boundaries of the State of Hawaii, title to which is held by the United States immediately prior to its admission into the Union." §5(b), *id.*, at 5. These lands, "together with the proceeds from the sale or other disposition of [these] lands and the income therefrom, shall be held by [the] State as a public trust" to promote various public purposes, including supporting public education, bettering conditions of Native Hawaiians, developing home ownership, making public improvements, and providing lands for public use. §5(f), *id.*, at 6. Hawaii state law also authorizes the State to use or sell the ceded lands, provided that the proceeds are held in trust for the benefit of the citizens of Hawaii. See, *e.g.*, Haw. Rev. Stat. §§171–45, 171–18 (1993).

In 1993, Congress enacted a joint resolution "to acknowledge the historic significance of the illegal overthrow of the Kingdom of Hawaii, to express its deep regret to the Native Hawaiian people, and to support the reconciliation efforts of the State of Hawaii and the United Church of Christ with Native Hawaiians." Joint Resolution to Acknowledge the 100th Anniversary of the January 17, 1893 Overthrow of the Kingdom of Hawaii, Pub. L. 103–150, 107 Stat. 1510, 1513 (hereinafter Apology Resolution). In a series of the preambular "whereas" clauses, Congress made various observations about Hawaii's history. For example, the Apology Resolution states that "the indigenous Hawaiian people never directly relinquished their claims . . . over their national lands to the United States" and that "the health and well-being of the Native Hawaiian people is intrinsically tied to their deep feelings and

attachment to the land." *Id.*, at 1512. In the same vein, the resolution's only substantive section—entitled "Acknowledgement and Apology"—states that Congress:

> "(1) . . . acknowledges the historical significance of this event which resulted in the suppression of the inherent sovereignty of the Native Hawaiian people;
>
> "(2) recognizes and commends efforts of reconciliation initiated by the State of Hawaii and the United Church of Christ with Native Hawaiians;
>
> "(3) apologizes to Native Hawaiians on behalf of the people of the United States for the overthrow of the Kingdom of Hawaii on January 17, 1893 with the participation of agents and citizens of the United States, and the deprivation of the rights of Native Hawaiians to self-determination;
>
> "(4) expresses its commitment to acknowledge the ramifications of the overthrow of the Kingdom of Hawaii, in order to provide a proper foundation for reconciliation between the United States and the Native Hawaiian people; and
>
> "(5) urges the President of the United States to also acknowledge the ramifications of the overthrow of the Kingdom of Hawaii and to support reconciliation efforts between the United States and the Native Hawaiian people." *Id.*, at 1513.

Finally, §3 of the Apology Resolution states that "Nothing in this Joint Resolution is intended to serve as a settlement of any claims against the United States." *Id.*, at 1514.

## B

This suit involves a tract of former crown land on Maui, now known as the "Leiali'i parcel," that was ceded in "absolute fee" to the United States at annexation and has been held by the State since 1959 as part of the trust

established by §5(f) of the Admission Act.  The Housing
Finance and Development Corporation (HFDC)—Hawaii's
affordable housing agency—received approval to remove
the Leiali'i parcel from the §5(f) trust and redevelop it.  In
order to transfer the Leiali'i parcel out of the public trust,
HFDC was required to compensate respondent Office of
Hawaiian Affairs (OHA), which was established to receive
and manage funds from the use or sale of the ceded lands
for the benefit of native Hawaiians.  Haw. Const., Art. XII,
§§4–6.

In this case, however, OHA demanded more than mone-
tary compensation.  Relying on the Apology Resolution,
respondent OHA demanded that HFDC include a dis-
claimer preserving any native Hawaiian claims to owner-
ship of lands transferred from the public trust for redevel-
opment.   HFDC declined to include the requested
disclaimer because "to do so would place a cloud on title,
rendering title insurance unavailable."  App. to Pet. for
Cert. 207a.

Again relying on the Apology Resolution, respondents
then sued the State, its Governor, HFDC (since renamed),
and its officials.  Respondents sought "to enjoin the defen-
dants from selling or otherwise transferring the Leiali'i
parcel to third parties and selling or otherwise transfer-
ring to third parties any of the ceded lands in general until
a determination of the native Hawaiians' claims to the
ceded lands is made." *Office of Hawaiian Affairs* v. *Hous-
ing and Community Development Corp. of Hawaii*, 117
Haw. 174, 189, 177 P. 3d 884, 899 (2008).  Respondents
"alleged that an injunction was proper because, in light of
the Apology Resolution, any transfer of ceded lands by the
State to third-parties would amount to a breach of trust
. . . ." *Id.*, at 188, 177 P. 3d, at 898.

The state trial court entered judgment against respon-
dents, but the Supreme Court of Hawaii vacated the lower
court's ruling.  Relying on a "plain reading of the Apology

Resolution," which "dictate[d]" its conclusion, *id.*, at 212, 177 P. 3d, at 988, the State Supreme Court ordered "an injunction against the defendants from selling or otherwise transferring to third parties (1) the Leiali'i parcel and (2) any other ceded lands from the public lands trust until the claims of the native Hawaiians to the ceded lands have been resolved," *id.*, at 218, 177 P. 3d, at 928. In doing so, the court rejected petitioners' argument that "the State has the undoubted and explicit power to sell ceded lands pursuant to the terms of the Admission Act and pursuant to state law." *Id.*, at 211, 177 P. 3d, at 920 (internal quotation marks and alterations omitted). We granted certiorari. 555 U. S. ___ (2008).

## II

Before turning to the merits, we first must address our jurisdiction. According to respondents, the Supreme Court of Hawaii "merely held that, in light of the ongoing reconciliation process, the sale of ceded lands would constitute a breach of the State's fiduciary duty to Native Hawaiians *under state law*." Brief for Respondents 17. Because respondents believe that this case does not raise a federal question, they urge us to dismiss for lack of jurisdiction.

Although respondents dwell at length on that argument, see *id.*, at 19–34, we need not tarry long to reject it. This Court has jurisdiction whenever "a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041 (1983). Far from providing a "plain statement" that its decision rested on state law, *id.*, at 1041, the State Supreme Court plainly held that its decision was "dictate[d]" by federal law—in particular, the Apology Resolution, see 117 Haw., at 212, 177 P. 3d, at 922. Indeed, the court explained that the Apology Resolu-

tion lies "[a]t the heart of [respondents'] claims," that respondents' "current claim for injunctive relief is . . . based largely upon the Apology Resolution," and that respondents' arguments presuppose that the Apology Resolution "changed the legal landscape and restructured the rights and obligations of the State." *Id.*, at 189–190, 177 P. 3d, at 899–900 (internal quotation marks omitted). The court noted that "[t]he primary question before this court on appeal is whether, in light of the Apology Resolution, this court should *issue an injunction*" against sale of the trust lands, *id.*, at 210, 177 P. 3d, at 920, and it concluded, "[b]ased on a plain reading" of the Apology Resolution, that "Congress has clearly recognized that the native Hawaiian people have unrelinquished claims over the ceded lands," *id.*, at 191, 177 P. 3d, at 901.

Based on these and the remainder of the State Supreme Court's 77 references to the Apology Resolution, we have no doubt that the decision below rested on federal law.[2] We are therefore satisfied that this Court has jurisdiction. See 28 U. S. C. §1257.

### III

Turning to the merits, we must decide whether the Apology Resolution "strips Hawaii of its sovereign authority to sell, exchange, or transfer" (Pet. for Cert. i) the lands

_____

[2] Respondents argue that the Supreme Court of Hawaii relied on the Apology Resolution "simply to support its factual determination that Native Hawaiians have unresolved claims to the ceded lands." Brief for Respondents 21. Regardless of its factual determinations, however, the lower court's *legal* conclusions were, at the very least, "interwoven with the federal law." *Michigan* v. *Long*, 463 U. S. 1032, 1040 (1983). See *Office of Hawaiian Affairs* v. *Housing and Community Development Corp. of Hawaii*, 117 Haw. 174, 217, 218, 177 P. 3d 884, 927, 928 (2008) ("hold[ing]" that respondents' legal claim "arose" only when "the Apology Resolution was signed into law on November 23, 1993"); *id.*, at 211, n. 25, 177 P. 3d, at 921, n. 25 (emphasizing that "our holding is grounded in Hawai'i and federal law"). See also n. 4, *infra.*

that the United States held in "absolute fee" (30 Stat. 750) and "grant[ed] to the State of Hawaii, effective upon its admission into the Union" (73 Stat. 5). We conclude that the Apology Resolution has no such effect.

## A

"We begin, as always, with the text of the statute." *Permanent Mission of India to United Nations* v. *City of New York*, 551 U. S. 193, 197 (2007). The Apology Resolution contains two substantive provisions. See 107 Stat. 1513–1514. Neither justifies the judgment below.

The resolution's first substantive provision uses six verbs, all of which are conciliatory or precatory. Specifically, Congress "acknowledge[d] the historical significance" of the Hawaiian monarchy's overthrow, "recognize[d] and commend[ed] efforts of reconciliation" with native Hawaiians, "apologize[d] to [n]ative Hawaiians" for the monarchy's overthrow, "expresse[d] [Congress's] commitment to acknowledge the ramifications of the overthrow," and "urge[d] the President of the United States to also acknowledge the ramifications of the overthrow . . . ." §1. Such terms are not the kind that Congress uses to create substantive rights—especially those that are enforceable against the cosovereign States. See, *e.g.*, *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17–18 (1981).[3]

---

[3] The Apology Resolution's operative provisions thus stand in sharp contrast with those of other "apologies," which Congress intended to have substantive effect. See, *e.g.*, Civil Liberties Act of 1988, 102 Stat. 903, 50 U. S. C. App. §1989 (2000 ed.) (acknowledging and apologizing "for the evacuation, relocation and internment" of Japanese citizens during World War II and providing $20,000 in restitution to each eligible individual); Radiation Exposure Compensation Act, 104 Stat. 920, notes following 42 U. S. C. §2210 (2000 ed. and Supp. V) ("apologiz[ing] on behalf of the Nation . . . for the hardships" endured by those exposed to radiation from above-ground nuclear testing facilities and providing $100,000 in compensation to each eligible individual).

The Apology Resolution's second and final substantive provision is a disclaimer, which provides: "Nothing in this Joint Resolution is intended to serve as a settlement of any claims against the United States." §3. By its terms, §3 speaks only to those who may or may not have "claims *against the United States.*" The court below, however, held that the only way to save §3 from superfluity is to construe it as a congressional recognition—and preservation—of claims *against Hawaii* and as "the *foundation* (or starting point) for reconciliation" between the State and native Hawaiians. 117 Haw., at 192, 177 P. 3d, at 902.

"We must have regard to all the words used by Congress, and as far as possible give effect to them," *Louisville & Nashville R. Co.* v. *Mottley*, 219 U. S. 467, 475 (1911), but that maxim is not a judicial license to turn an irrelevant statutory provision into a relevant one. And we know of no justification for turning an express disclaimer of claims against one sovereign into an affirmative recognition of claims against another.[4] Cf. *Pacific Bell Telephone Co.* v. *linkLine Communications, Inc.*, 555 U. S. \_\_\_, \_\_\_

---

[4] The court below held that respondents "prevailed on the merits" by showing that "Congress has clearly recognized that the native Hawaiian people have unrelinquished claims over the ceded lands, which were taken without consent or compensation and which the native Hawaiian people are determined to preserve, develop, and transmit to future generations." 117 Haw., at 212, 177 P. 3d, at 922. And it further held that petitioners failed to show that the State has the "power to sell ceded lands pursuant to the terms of the Admission Act." *Id.*, at 211, 177 P. 3d, at 921 (internal quotation marks and alterations omitted). Respondents now insist, however, that their claims are "nonjusticiable" to the extent that they are grounded on "broader moral and political" bases. Brief for Respondents 18. No matter how respondents characterize their claims, it is undeniable that they have asserted title to the ceded lands throughout this litigation, see *id.*, at 40, n. 15 (conceding the point), and it is undeniable that the Supreme Court of Hawaii relied on those claims in issuing an injunction, which is a legal (and hence justiciable) remedy—not a moral, political, or nonjusticiable one.

(2009) (slip op., at 17) ("Two wrong claims do not make one that is right"). The Supreme Court of Hawaii erred in reading §3 as recognizing claims inconsistent with the title held in "absolute fee" by the United States (30 Stat. 750) and conveyed to the State of Hawaii at statehood. See *supra*, at 2–3.

## B

Rather than focusing on the operative words of the law, the court below directed its attention to the 37 "whereas" clauses that preface the Apology Resolution. See 107 Stat. 1510–1513. "Based on a plain reading of" the "whereas" clauses, the Supreme Court of Hawaii held that "Congress has clearly recognized that the native Hawaiian people have unrelinquished claims over the ceded lands." 117 Haw., at 191, 177 P. 3d, at 901. That conclusion is wrong for at least three reasons.

First, "whereas" clauses like those in the Apology Resolution cannot bear the weight that the lower court placed on them. As we recently explained in a different context, "where the text of a clause itself indicates that it does not have operative effect, such as 'whereas' clauses in federal legislation . . . , a court has no license to make it do what it was not designed to do." *District of Columbia* v. *Heller*, 554 U. S. ___, ___, n. 3 (2008) (slip op., at 4, n. 3). See also *Yazoo & Mississippi Valley R. Co.* v. *Thomas*, 132 U. S. 174, 188 (1889) ("[A]s the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous, the necessity of resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up").

Second, even if the "whereas" clauses had some legal effect, they did not "chang[e] the legal landscape and restructur[e] the rights and obligations of the State." 117 Haw., at 190, 177 P. 3d, at 900. As we have emphasized,

"repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal [is] clear and manifest." *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 662 (2007) (internal quotation marks omitted). The Apology Resolution reveals no indication—much less a "clear and manifest" one—that Congress intended to amend or repeal the State's rights and obligations under Admission Act (or any other federal law); nor does the Apology Resolution reveal any evidence that Congress intended *sub silentio* to "cloud" the title that the United States held in "absolute fee" and transferred to the State in 1959. On that score, we find it telling that even respondent OHA has now abandoned its argument, made below, that "Congress . . . enacted the Apology Resolution and thus . . . change[d]" the Admission Act. App. 114a; see also Tr. of Oral Arg. 31, 37–38.

Third, the Apology Resolution would raise grave constitutional concerns if it purported to "cloud" Hawaii's title to its sovereign lands more than three decades after the State's admission to the Union. We have emphasized that "Congress cannot, after statehood, reserve or convey submerged lands that have already been bestowed upon a State." *Idaho* v. *United States*, 533 U. S. 262, 280, n. 9 (2001) (internal quotation marks and alteration omitted); see also *id.*, at 284 (Rehnquist, C. J., dissenting) ("[T]he consequences of admission are instantaneous, and it ignores the uniquely sovereign character of that event . . . to suggest that subsequent events somehow can diminish what has already been bestowed"). And that proposition applies *a fortiori* where virtually all of the State's public lands—not just its submerged ones—are at stake. In light of those concerns, we must not read the Apology Resolution's nonsubstantive "whereas" clauses to create a retroactive "cloud" on the title that Congress granted to the State of Hawaii in 1959. See, *e.g.*, *Clark* v. *Martinez*, 543 U. S. 371, 381–382 (2005) (the canon of constitutional

avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

\*        \*        \*

When a state supreme court incorrectly bases a decision on federal law, the court's decision improperly prevents the citizens of the State from addressing the issue in question through the processes provided by the State's constitution. Here, the State Supreme Court incorrectly held that Congress, by adopting the Apology Resolution, took away from the citizens of Hawaii the authority to resolve an issue that is of great importance to the people of the State. Respondents defend that decision by arguing that they have both state-law property rights in the land in question and "broader moral and political claims for compensation for the wrongs of the past." Brief for Respondents 18. But we have no authority to decide questions of Hawaiian law or to provide redress for past wrongs except as provided for by federal law. The judgment of the Supreme Court of Hawaii is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*