225 P.3d 659

**STOP RAIL NOW, a nonprofit organization; Let Honolulu Vote, a nonprofit organization; League of Women Voters of Honolulu, a nonprofit organization; Sensible Traffic Alternatives & Resources, Inc., dba Honolulu Traffic.Com, a nonprofit organization; Paul De Gracia; Paul E. Smith; Robert Kessler; Warren P. Berry; Jeremy Lam, M.D.; Scott R. Wilson; Dennis Callan; and Samuel Slom, Petitioners/Plaintiffs–Appellants,**

v.

**Denise C. DE COSTA, in her capacity as City Clerk of the City and County of Honolulu, Respondent/Defendant–Appellee.**

**No. 29354.**

Intermediate Court of Appeals of Hawai'i.

Dec. 30, 2009.

Earle A. Partington, Honolulu, on the briefs, for Petitioners/Plaintiffs–Appellants.

Don S. Kitaoka, Diane T. Kawauchi, Reid M. Yamashiro, Dawn D.M. Spurlin, Deputies Corporation Counsel, City and County of Honolulu, on the briefs, for Defendant/Respondent–Appellee.

WATANABE, Presiding Judge, LEONARD, J., and Circuit Judge TOWN, assigned by Reason of Recusals and Vacancy.[1]

Opinion of the Court by LEONARD, J.

Petitioners/Plaintiffs–Appellants Stop Rail Now, a nonprofit organization, Let Honolulu Vote, a nonprofit organization, League of Women Voters of Honolulu, a nonprofit organization, Sensible Traffic Alternatives & Resources Inc., dba HonoluluTraffic.com, a nonprofit organization, Paul De Gracia, Paul E. Smith, Robert Kessler, Warren P. Berry, Jeremy Lam, M.D., Scott R. Wilson, Dennis Callan (**Callan**), and Samuel Slom (**collectively, Stop Rail**) appeal from the Circuit Court of the First Circuit's (**Circuit Court**) September 12, 2008 Judgment (1) entered in favor of Stop Rail and against Respondent/Defendant–Appellee Denise C. De Costa, in her capacity as City Clerk of the City and County of Honolulu (**City Clerk**), on Stop Rail's claim for a preliminary and permanent injunction, (2) entered in favor of the City Clerk and against Stop Rail on all remaining claims, and (3) dismissing any remaining parties and/or claims (**Judgment**).[2]

On this appeal, Stop Rail contends that the Circuit Court erred in its interpretation of

<hr />

1. Former Chief Judge Mark E. Recktenwald, who sat on the motions panel for this case, was sworn in as an Associate Justice of the Hawai'i Supreme Court on May 11, 2009. Due to recusals by the other Intermediate Court of Appeals judges, First Circuit Court Judge Michael A. Town was assigned to this case.

2. The Honorable Karl S. Sakamoto presided.

the Revised Charter of the City and County of Honolulu (2000 ed. & Supp.2003)[3] **(Charter)**. We hold: (1) Article III, Chapter 4, of the Charter contains apparently conflicting provisions and is ambiguous; (2) § 3–402 of the Charter sets forth four base or threshold requirements for all petitions for ordinance by initiative; (3) we cannot read Charter § 3–404(3) to negate implicitly the threshold number of signatures required for an ordinance by initiative petition under § 3–402(1), as amended; and (4) therefore, the Circuit Court did not err in refusing to order that Stop Rail's charter amendment proposal be placed on the 2008 general election ballot because the threshold signature requirement set forth in § 3–402(1) was not met. We affirm.

## I. RELEVANT FACTS

### A. Stop Rail's Petition

The relevant facts are not in dispute.

On August 4, 2008, Stop Rail submitted to the City Clerk a Petition for Proposed Ordinance by Initiative **(Petition)**, purportedly signed by over 49,000 registered voters of the City and County of Honolulu **(Honolulu)**, which stated in relevant part:

**PETITION FOR PROPOSED ORDINANCE BY INITIATIVE**

**"Honolulu mass transit shall not include trains or rail transit."**

The following question is being submitted to the People of the City and County of Honolulu to be voted upon at a special election:

**SHALL AN ORDINANCE BE ADOPTED TO PROHIBIT TRAINS AND RAIL TRANSIT IN THE CITY AND COUNTY OF HONOLULU?**

**WE, THE UNDERSIGNED, AS DULY REGISTERED VOTERS IN THE CITY AND COUNTY OF HONOLULU, WITH FULL KNOWLEDGE OF THE CON-TENT OF THIS PETITION, PROPOSE AN ORDINANCE SUBSTANTIALLY IN THE MANNER SET FORTH: 1. TO PROHIBIT THE USE OF TRAINS OR RAIL TRANSIT IN ANY MASS TRANSIT SYSTEM WITHIN THE CITY AND COUNTY OF HONOLULU; AND 2. TO BE EFFECTIVE IMMEDIATELY UPON APPROVAL.**

After examining the Petition, the City Clerk informed Stop Rail that she could not accept a petition for a special election at that time because the Charter did not permit the holding of an initiative special election within 180 days of a general election. The Petition was removed from the City Clerk's office without a determination of the number of valid signatures the Petition contained.

### B. The Circuit Court Proceedings

On August 6, 2008, Stop Rail filed the following documents in the Circuit Court: (1) a Petition for Writ of Mandamus or, Alternatively, Complaint for Declaratory and Injunctive Relief; Summons **(Complaint)**;[4] (2) a Motion for Preliminary Injunction, supported by a Memorandum in Support, the Declaration of Callan, and an exhibit (a copy of one page of the Petition) **(Circuit Court Motion)**. In the Circuit Court Motion, Stop Rail sought the following relief:

[A] preliminary injunction directed to the City Clerk ordering her to file and process the Petition for a special initiative election (as requested in the Petition/Complaint) as required by law and, if sufficient signatures are authenticated, to place the proposed ordinance on the November 4, 2008, general election ballot.

On August 12, 2008, the City Clerk filed a Memorandum in Opposition to the Circuit Court Motion that was supported by the Declaration of the City Clerk and four exhibits (letters from and to John S. Carroll, Esq.,

---

**3.** The Charter was further revised by amendments approved in the 2004 and 2006 general elections, as well as a 2007 Honolulu City Council Resolution. These further revisions are not relevant to the issues before the court.

**4.** The relief requested in the Complaint included a writ of mandamus, a declaratory judgment, and "a preliminary and permanent injunction directing the City Clerk to file and process the Petition as required by law and, if sufficient signatures are authenticated, to place the proposed ordinance on the November 4, 2008 general election ballot."

an email from Callan, and a page of the Petition that was similar to the page reviewed by the City Clerk on August 4, 2008). On August 13, 2008, Stop Rail filed a Reply Memorandum with no further declarations or exhibits.

On August 14, 2008, the Circuit Court held an expedited hearing on the Circuit Court Motion. On August 19, 2008, the Circuit Court entered an Order Granting the Circuit Court Motion. The Circuit Court concluded that there was no justification for the City Clerk's failure to accept the Petition for filing and processing, stating that "[e]ven though [Charter § 3–404(3) ] clearly prohibited the holding of an initiative special election during the 180 days immediately preceding the general election, nothing in [§ 3–404] suggests that the City Clerk was empowered to reject the petition outright." The Circuit Court ordered the City Clerk to immediately cease any continued refusal to accept the Petition for filing and processing and deemed the Petition to have been filed on August 4, 2008. On August 21, 2008, an Order of Correction was entered, along with an Amended Order Granting the Circuit Court Motion, correcting some numbering errors in the prior order's citations.

On August 25, 2008, Stop Rail filed a Motion for Partial Reconsideration or, in the Alternative, for Entry of Judgment (**Motion for Partial Reconsideration**) on the grounds that the Circuit Court had erred in its interpretation of the applicable Charter provisions. On August 26, 2008, the City Clerk filed an Answer to Stop Rail's Complaint and on August 29, 2008, the City Clerk filed a Memorandum in Opposition to the Motion for Partial Reconsideration. A hearing on the Motion for Partial Reconsideration was scheduled, on shortened time, for September 3, 2008.

Following the September 3, 2008 hearing, the Circuit Court, without reference to the Motion for Partial Reconsideration, entered a Second Amended Order Granting the Circuit Court Motion (**Second Amended Order**). The Second Amended Order did not change the effect of the Circuit Court's prior ruling, but modified, in some instances, the explanation of the Circuit Court's decision. In sum,

the Circuit Court granted a preliminary injunction in favor of Stop Rail, required the City Clerk to accept the Petition and certify the number of qualified signatures, and determined, in effect, that 44,525 qualified signatures were needed to place the Petition on the ballot, rather than the lower number of qualified signatures, *i.e.,* 29,454, that Stop Rail maintained was required.

On September 9, 2008, Stop Rail filed a document entitled Petitioners–Plaintiffs' Exhibit 2, which submitted "for the record" the Certificate of the City Clerk regarding her examination of the Petition and tabulation of the total number of qualified, disqualified, or withdrawn signatures on the Petition (**Clerk's Certificate**). In the Clerk's Certificate, the City Clerk certified 35,065 qualified signatures on the Petition.

On September 12, 2008, the Circuit Court entered a Judgment in favor of Stop Rail and against the City Clerk on the claim for a preliminary and permanent injunction, in favor of the City Clerk and against Stop Rail on all remaining claims, and dismissing any and all parties and/or claims. On the same day, Stop Rail filed a Notice of Appeal. No cross-appeal was filed.

### C. *The City's Ballot Question*

On August 20, 2008, Resolution No. 08–166, CD1, FD1 (**Reso 08–166**) passed a third reading before the Honolulu City Council. Reso 08–166 provided in relevant part:

WHEREAS, it has been reported by the news media that the Circuit Court of the First Circuit has ruled in favor of "Stop Rail Now" in Civil No. 08–1–1605–08(KKS), and has ordered the city clerk to file and process its initiative petition; and

WHEREAS, the initiative petition of "Stop Rail Now" was filed with the city clerk on August 14, [sic] 2008 as Petition 53 (2008); and

WHEREAS, the charter amendment proposed herein will be neither needed nor desirable if the ballot question posed in "Stop Rail Now's" Petition 53 (2008) ("Petition 53 ballot question") is placed on the 2008 general election ballot for a vote by the electorate; and

WHEREAS, the council wishes to place the charter amendment proposed herein on the 2008 general election ballot only if the ballot question posed in Petition 53 (2008) is not placed on the 2008 general election ballot; now, therefore,

BE IT RESOLVED by the Council of the City and County of Honolulu:

1. That it propose and it is hereby proposed that the following question be placed on the 2008 general election ballot; provided that if the ballot question posed in Petition 53 (2008), either in its original form or as it may be altered or restated pursuant to RCH Section 3–406, is included in the ballot language submitted by the city clerk to the chief election officer of the State of Hawaii pursuant to HRS Section 11–119(b), the following question shall not be placed on the ballot:

"Shall the powers, duties, and functions of the city, through its director of transportation services, include establishment of a steel wheel on steel rail transit system?"

On August 22, 2008, the Mayor of Honolulu approved Reso 08–166, pursuant to § 15–102(1) of the Charter. Under the terms of Reso 08–166, if Stop Rail's initiative question was *not* placed on the general election ballot, the Charter amendment question of Reso 08–166 would be placed on the general election ballot.

## D. *The Supreme Court Proceedings*

On August 26, 2008, Stop Rail filed a Petition for Writ of Mandamus in the Hawai'i Supreme Court, seeking: (1) a declaration that "the 'fifteen percent' and 'ten percent' from the charter subsection refer to the same standard-the number of *actual* voters in the last general mayoral election;" and (2) a writ of mandamus directed to the Circuit Court "ordering the circuit court to so hold and to direct the City Clerk to place the proposed ordinance on the November 4, 2008, general election ballot if she finds duly authenticated signatures equal to ten percent of the num-

ber of *actual* voters in the last mayoral election." On September 3, 2008, the supreme court entered an order denying the requested relief based on the conclusion that Stop Rail had not demonstrated an entitlement to mandamus relief.

## E. *The Preliminary ICA Proceedings*

On September 15, 2008, Stop Rail filed with this court an Emergency Motion for Preliminary Injunction Directing the City Clerk to Place Petition 53 of 2008 on the November 4, 2008 General Election Ballot (**ICA Motion**). Citing Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 27, Stop Rail moved this court "for a preliminary injunction directing [City Clerk] to place Petition 53 of 2008 on the November 4, 2008 ballot." On September 17 and 18, 2008, this court entered orders establishing parameters for further briefing of the issues and setting the matter for hearing. After further memoranda were filed by both parties, the ICA Motion came on for hearing before the court on September 22, 2008. We concluded that:[5]

(1) this court has appellate jurisdiction; (2) Stop Rail has made a sufficient showing on the merits of their appeal to require us to weigh the issues of irreparable harm and whether the public's interests would be furthered by the requested relief, although there are other potentially meritorious interpretations of the relevant City and County of Honolulu Charter provisions; (3) there is evidence before the court that granting the requested relief could engender unintended, serious, negative consequences for the upcoming general election, including potential disenfranchisement of absentee uniformed services voters and overseas voters, operational and logistical impact to the entire State election timetable, voter confusion, and/or jeopardy to the validity of the votes cast on the issue of rail transit in Honolulu; (4) that harm outweighs the harm that will be suffered by Stop Rail if its form of the ballot question on rail transit is not placed on this year's general election ballot, par-

---

5. The ICA motions panel that considered and ruled on the ICA Motion included then-Chief Judge Mark E. Recktenwald, Judge Corinne K.A. Watanabe, and Judge Katherine G. Leonard. As noted above, Chief Judge Recktenwald has since become a Hawai'i Supreme Court Justice.

ticularly since the public will have the opportunity to vote on an alternative form of the rail transit question; and (5) therefore, Stop Rail's request for a preliminary injunction is denied.

*Stop Rail Now v. De Costa,* 120 Hawai'i 238, 240, 203 P.3d 658, 660 (App.2008).

### F. *The Results of November 4, 2008 Vote*

The City Council's Charter amendment question, as set forth in Reso 08–166, was placed on the November 4, 2008 general election ballot. The State of Hawai'i Office of Elections reported the official result of the November 4, 2008 ballot as 156,051 yes votes (50.6%) and 140,818 no votes (45.7%) on the City Council's Charter amendment ballot question:[6] "Shall the powers, duties, and functions of the city, through its director of transportation services, include establishment of a steel wheel on steel rail transit system?" Therefore, pursuant to Charter § 15–103, the amendment was "duly approved by a majority of the voters voting thereon."

### II. *POINT OF ERROR ON APPEAL*

Stop Rail frames the sole point of error on appeal as follows:

> The Circuit Court erred in holding that the phrase "but at least ten percent" in City & County Charter § 3–404(3) refers to "registered voters equal in number to at least ten percent of the total voters registered in the last regular mayoral election."

(Format altered.)

### III. *STANDARD OF REVIEW*

■ When interpreting a municipal charter and ordinances, we apply the same rule of construction that we apply to statutes. *Rees v. Carlisle,* 113 Hawai'i 446, 452, 153 P.3d 1131, 1137 (2007); *Weinberg v. City & County of Honolulu,* 82 Hawai'i 317, 322, 922 P.2d 371, 376 (1996). "Interpretation of a statute is a question of law which we review *de novo.*" *Kikuchi v. Brown,* 110 Hawai'i 204, 207, 130 P.3d 1069, 1072 (App.2006) (internal quotation marks and citation omitted).

**6.** There were also 11,456 blank votes (3.7%) and 118 over-votes (0%). *See* http://hawaii.gov/

### IV. *DISCUSSION*

#### A. *Ordinances by Initiative Power under the Charter*

The sole issue on appeal is whether the Circuit Court correctly interpreted Article III, Chapter 4, of the Charter, which provides:

### CHAPTER 4
### ORDINANCES BY INITIATIVE POWER

**Section 3–401. Declaration—**

1. Power. The power of electors to propose and adopt ordinances shall be the initiative power.

2. Limitation. The initiative power shall not extend to any ordinance authorizing or repealing the levy of taxes, the appropriation of money, the issuance of bonds, the salaries of county employees or officers, or any matter governed by collective bargaining contracts.

**Section 3–402. Procedure for Enactment and Adoption—**

1. Petition. An ordinance may be proposed by petition, signed by duly registered voters equal in number to at least ten percent of the total voters registered in the last regular mayoral election.

2. Form of Petition. Each voter signing such petition shall add to the signature, the voter's printed name, residence, social security number and the date of signing.

3. Affidavit on Petition. Signatures may be on separate sheets, but each sheet shall have appended to it the affidavit of some person, not necessarily a signer of the petition, that, to the best of the affiant's knowledge and belief, the persons whose signatures appear on the sheet are duly registered voters of the city, that they signed with full knowledge of the contents of the petition and that their residences are correctly given.

4. Proposed Ordinance. Such petition shall set forth the proposed ordinance, or a draft of the proposed ordinance may be attached and made a part of such petition.

elections/results/2008/general/files/cch.pdf at p. 2.

### Section 3–403. Filing and Examination of Signatures on Petition—

1. Duty of Clerk. Upon filing of such petition with the council, the clerk shall examine it to see whether it contains a sufficient number of apparently genuine signatures of duly registered voters. The clerk may question the genuineness of any signature or signatures appearing on the petition, and if the clerk finds that any such signature or signatures are not genuine, the clerk shall, after public disclosure of the signatures in question, disregard them in determining whether the petition contains a sufficient number of signatures.

2. Clerk to Reject Petition, When. The clerk shall eliminate any sheet of the petition which is not accompanied by the required affidavit. The invalidity of any sheet shall not affect the validity of the petition if a sufficient number of signatures remains after eliminating such invalid sheet. The clerk shall complete the examination of the petition within twenty working days after the date of filing with the council.

3. Review by the Court. A final determination as to the sufficiency or validity of the petition may be subject to court review.

### Section 3–404. Submission of Proposal to Electors—

1. For General Elections. Any petition for proposed ordinance which has been filed with the council at least ninety days prior to a general election and which has been certified by the clerk, shall be submitted to electors for the aforementioned general election.

2. For Scheduled Special Elections. If any petition for proposed ordinance is filed at least ninety days before a scheduled special election within the city and which has been certified by the clerk, it shall be submitted to the electors for the aforementioned special election.

3. For Initiative Special Elections. A special election for an ordinance by initiative power shall be called within ninety days of filing of the petition if signed by duly registered voters equal in number to at least fifteen percent of the votes cast for mayor in the last regular mayoral election, and if such petition specifies that a special election be called; provided that if the clerk certifies less than fifteen percent but at least ten percent, the proposed ordinance shall be submitted at the next general election or scheduled special election. No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.

4. Adoption by the Council. If the council introduces and adopts after three separate readings, including a public hearing, the proposed ordinance which was the basis for a petition on or before ten days prior to date of publication of the proposed ordinance as required in this charter, then the proposed ordinance need not be submitted to the electors.

### Section 3–405. Adoption, Effective Date and Limitation—

1. Adoption and Effective Date of Ordinance. Any proposed ordinance which is approved by the majority of voters voting thereon shall be adopted, and shall become effective ten days after certification of the results of the election, or at the time and under the conditions specified in the ordinance; provided, however, that in the event that two or more proposed ordinances conflict with each other in whole or in part and each is approved by a majority of the voters voting thereon, the proposed ordinance receiving the highest number of votes shall be adopted and shall take effect as aforesaid.

2. No Veto. No ordinance adopted by the initiative power shall be subject to mayoral veto.

3. Limitation Against Council. No ordinance adopted by initiative power shall be amended or repealed by the council within two years after adoption, except as a result of subsequent initiative or by an ordinance adopted by the affirmative vote of at least three quarters of the entire council after public hearing.

### Section 3–406. Approval of Alteration—

1. Amendments Made by Corporation Counsel. The petition shall designate and

authorize not less than three nor more than five of the signers thereto to approve any alterations in form or language, or any restatement of the text of the proposed ordinance which may be made by the corporation counsel.

2. Restatement of Proposed Ordinance on Ballot. The same designated and authorized signers shall approve any restatement of the proposed ordinance on the ballot.

**Section 3–407. Inconsistent Provisions—**

All rules, ordinances and Revised Charter provisions which are inconsistent with this chapter shall be superseded by the provisions of this chapter from its effective date.

Thusly, the Charter sets forth a comprehensive scheme: providing initiative power to the electorate (§ 3–401); establishing procedures whereby an ordinance may be proposed through a petition that meets certain specified requirements (§ 3–402); establishing the duties of the City Clerk upon receipt of an initiative petition (§ 3–403); providing three ways a proposed ordinance by initiative might then be submitted to the electorate (§ 3–404); and stating certain other provisions not relevant to this appeal (§§ 3–405, 3–406, & 3–407).

B. *Stop Rail's Argument*

As Stop Rail frames the argument, the one and only issue in this appeal is the meaning

of the "provided" clause in the first sentence of § 3–404(3):

3. For Initiative Special Elections. A special election for an ordinance by initiative power shall be called within ninety days of filing of the petition if signed by duly registered voters equal in number to *at least fifteen percent of the votes cast* for mayor in the last regular mayoral election, and if such petition specifies that a special election be called; *provided that if the clerk certifies less than fifteen percent but at least ten percent, the proposed ordinance shall be submitted at the next general election or scheduled special election.* No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.

(Emphases added.)

 Stop Rail argues that, under the canon of construction denominated *noscitur a sociis,*[7] the "votes cast standard" laid down in the immediately prior reference is a strong indication that the references "fifteen percent" and "ten percent" in the "provided" clause should be interpreted to mean "fifteen percent of the votes cast" and "ten percent of the votes cast." Stop Rail contends that the Circuit Court erred in holding that the phrase "but at least ten percent" in § 3–404(3) refers to *registered voters* equal in number to at least ten percent of the total voters registered in the last regular mayoral election as required by § 3–402(1). Stop Rail urges this court to adopt a "plain language" interpretation, arguing that there is

---

7. *Noscitur a sociis* provides that the meaning of words may be determined by reference to their relationship with other associated words and phrases. *State v. Merino,* 81 Hawai'i 198, 217, 915 P.2d 672, 691 (1996). "When two or more words are grouped together, *noscitur a sociis* requires that the more general and the more specific words of a statute must be considered together in determining the meaning of a statute, and that the general words are restricted to a meaning that should not be inconsistent with, or alien to, the narrower meanings of the more specific words of the statute." *In re Pac. Marine & Supply Co. Ltd.,* 55 Haw. 572, 578 n. 5, 524 P.2d 890, 895 n. 5 (1974). Although the canon of *noscitur a sociis* may indicate that the "ten percent" in City Charter § 3–404(3) refers to "votes cast," Stop Rail's argument fails to take into account that when there is ambiguity in a

statute, the "meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." *Estate of Roxas v. Marcos,* 121 Hawai'i 59, 66, 214 P.3d 598, 605 (2009). A statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses. *Gillan v. Gov't Employees Ins. Co.,* 119 Hawai'i 109, 117, 194 P.3d 1071, 1079 (2008). As discussed later in the opinion, the "ten percent" language in § 3–404(3) could be understood by reasonable people to refer to either the "votes cast" language laid out in the preceding clause, or to the ten percent voters registered standard in § 3–402(1). Since the "ten percent" language is ambiguous, the court must examine the context of the ordinance in order to ascertain its meaning.

no ambiguity in § 3–404(3) and that a literal construction would not produce an absurd or unjust result.

### C. Interpretation of the Charter Provisions Governing the Adoption of Ordinances by Initiative

■ It is well established that the fundamental starting point for statutory construction is the language of the statute itself. *State v. Bayly,* 118 Hawaiʻi 1, 6, 185 P.3d 186, 191 (2008). Nevertheless, consideration of § 3–404(3) in the context of the entire chapter providing the initiative power to the electors, which we must do, calls into question the strength of Stop Rail's arguments. *See, e.g., Office of Hawaiian Affairs v. Hous. and Comty. Dev. Corp. of Haw.,* 117 Hawaiʻi 174, 191, 177 P.3d 884, 901 (2008), *reversed and remanded on other grounds, Hawaii v. Office of Hawaiian Affairs,* ── U.S. ──, 129 S.Ct. 1436, 173 L.Ed.2d 333 (2009) ("[I]t is a cardinal rule of statutory construction that courts are bound, if rational and practical, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute."); *Coon v. City and County of Honolulu,* 98 Hawaiʻi 233, 259, 47 P.3d 348, 374 (2002) (same); *Franks v. City and County of Honolulu,* 74 Haw. 328, 335, 843 P.2d 668, 671 (1993) ("We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.").

■ When considered in conjunction with the other provisions of Article III, Chapter 4, the meaning and intended effect of § 3–404(3) is ambiguous. The adoption of Stop Rail's interpretation would nullify the requirements of § 3–402(1), which provides:

**Section 3–402. Procedure for Enactment and Adoption—**

1. Petition. An ordinance may be proposed by petition, signed by duly registered voters equal in number to **at least ten percent of the total voters registered** in the last regular mayoral election.

Stop Rail argues that the "general" requirement of § 3–402(1), requiring signatures of at least ten percent of the *"registered voters,"* should not be applied to the Petition in light of the more "specific" language of § 3–404(3), which Stop Rail argues requires only signatures of at least ten percent of the "votes casts" for a *special initiative election* petition to be placed on a general election ballot. Stop Rail admits, however, the language of § 3–402 does not limit itself to *general election* and/or *scheduled special election* petitions. Indeed, it appears from the record that Stop Rail implicitly acknowledged the applicability of all of the *other* subsections of § 3–402, which set forth the initial procedures through which an ordinance can be enacted and adopted:

**Section 3–402. Procedure for Enactment and Adoption—**

1. Petition. An ordinance may be proposed by petition, signed by duly registered voters equal in number to at least ten percent of the total voters registered in the last regular mayoral election.

2. Form of Petition. Each voter signing such petition shall add to the signature, the voter's printed name, residence, social security number and the date of signing.

3. Affidavit on Petition. Signatures may be on separate sheets, but each sheet shall have appended to it the affidavit of some person, not necessarily a signer of the petition, that, to the best of the affiant's knowledge and belief, the persons whose signatures appear on the sheet are duly registered voters of the city, that they signed with full knowledge of the contents of the petition and that their residences are correctly given.

4. Proposed Ordinance. Such petition shall set forth the proposed ordinance, or a draft of the proposed ordinance may be attached and made a part of such petition.

While it was preparing the Petition for filing, Stop Rail made inquiries to the City Clerk regarding how to meet the affidavit requirements of § 3–402(3). Stop Rail's Petition "set forth the proposed ordinance," as provided in § 3–402(4). Stop Rail did not challenge the City Clerk's disqualification of signatures that did not meet the require-

ments of § 3–402(2). It appears that Stop Rail only construes § 3–402(1) to be inapplicable to the Petition. We conclude, contrary to Stop Rail's position, that Charter § 3–402 sets a "threshold" for *all* petitions for ordinances by initiative power, whether the petitioners seek to submit the proposal at a general election, a scheduled special election, or an initiative special election. Each part of § 3–402 must be satisfied before any petition for a proposed ordinance may be submitted to the electors by any of the means described in § 3–404. It is the City Clerk's duty, pursuant to § 3–403, to determine whether a petition meets the threshold requirements of § 3–402. Only upon the City Clerk's certification of a petition may the petition be submitted to the voters.

### D. *Legislative History*

The ambiguity and apparent inconsistency in Article III, Chapter 4, of the Charter arose out of the 1992 amendments to the Charter. Prior to 1992, § 3–402(1) stated:

> 1. Petition. An ordinance may be proposed by petition, signed by qualified electors equal in number to *at least ten percent of the entire vote cast* for mayor in the last preceding mayoral election. (Emphasis Added).

The change to the language of § 3–402(1) resulted from the November 3, 1992 General Election ballot, which asked voters to vote yes or no on the following Charter amendment:

> 15. CHANGE SIGNATURE REQUIREMENTS FOR RECALL AND INITIATIVE FROM BASE OF "TOTAL VOTES CAST" TO "TOTAL REGISTERED VOTERS"

The proposed amendment passed; a total of 123,535 electors voted yes and 111,950 voted no.

Neither the Charter Commission Brochure explaining the proposed changes nor the Charter Commission Report that serves as the legislative history of the 1992 proposal gives any indication that this amendment was intended to affect some, but not all, kinds of initiative petitions. On the contrary, the 1992 Charter Commission Brochure explained the proposed amendment as follows:

> 15. Should the number of signatures required on a petition for recall or initiative be changed from a basis of "total votes cast" to "total registered voters"?
>
> Present: Both recall and initiative petitions required the signatures of 10 percent of the total number of "votes cast" in the last general election.
>
> If proposal passes: Both recall and initiative petitions would require the signatures of 10 percent of the total number of "registered voters" at the time of the last general election.

The legislative history clearly supports this court's interpretation that the § 3–402(1) proviso "ten percent of the total voters registered in the last regular mayoral election" was intended as a "base" or threshold for any ordinance proposed by an initiative petition.

Nevertheless, Stop Rail correctly points out that the 1992 Charter amendments included other changes to § 3–404(3), but did not change the "votes cast" standard to a "registered voter" standard. The 1992 legislative history gives us no guidance on this point and, in light of the ambiguity created by inconsistent standards, we are left with the firm impression that there was an inexplicable oversight in the drafting of the amendment.[8] As discussed in the following section, however, we reject Stop Rail's argument that Stop Rail's interpretation of § 3–404(3) does not lead to an absurd result.

### E. *The Impact of the Timing of a Petition on the Submission of a Proposed Ordinance to the Electors*

As stated above, Charter § 3–404 provides three ways that a proposed ordinance by initiative can be submitted to the electors. Stop Rail argues that § 3–404(3), entitled "For Initiative Special Elections," creates a "special rule" for such elections and that special initiative elections are not bound by the requirements for general elections and

---

8. Ideally, Article III, Chapter 4, of the Charter should be amended to harmonize and remove any doubt as to the meaning of its provisions. In the meantime, however, it is the duty of this court to give force to all of its provisions and not treat any of them as superfluous or insignificant.

scheduled special elections. Under Stop Rail's interpretation of § 3–404(3), not only would a petitioner be able to avoid the § 3–402(1) threshold of "ten percent of total voters registered in the last regular mayor election," but in addition, a petitioner would be able to avoid the deadline for placing a question on a general election ballot by requesting a special initiative election and submitting an insufficient number of signatures to meet the fifteen percent mark. The fallacy of this argument is evident from the logical and orderly timing requirements set forth in § 3–404.

First, § 3–404(1) provides:

1. For General Elections. Any petition for proposed ordinance which has been filed with the council at least ninety days prior to a general election and which has been certified by the clerk, shall be submitted to electors for the aforementioned general election.

Accordingly, an ordinance initiative petition must be filed at least ninety days prior to a general election to be placed on the general election ballot. This ninety-day minimum is consistent with the twenty-working-day period allotted to the City Clerk under § 3–403 to examine and certify the number of qualified signatures on a petition, and the deadline of sixty days prior to the election for the City Clerk to transmit the ballot question to the State Chief Election Officer. *See* HRS § 11–119(b) (1993).

Next, § 3–404(2) provides:

2. For Scheduled Special Elections. If any petition for proposed ordinance is filed at least ninety days before a scheduled special election within the city and which has been certified by the clerk, it shall be submitted to the electors for the aforementioned special election.

Thus, an ordinance initiative petition must be filed at least ninety days prior to a scheduled special election[9] to appear on the scheduled special election ballot. This parallel provision also provides a logical and reasonable time frame for the City Clerk's examination and certification of the petition, and the transmission of the ballot question to the State Chief Election Officer prior to a scheduled special election.

Finally, § 3–404(3) provides:

3. For Initiative Special Elections. A special election for an ordinance by initiative power shall be called within ninety days of filing of the petition if signed by duly registered voters equal in number to at least fifteen percent of the votes cast for mayor in the last regular mayoral election, and if such petition specifies that a special election be called; provided that if the clerk certifies less than fifteen percent but at least ten percent, the proposed ordinance shall be submitted at the next general election or scheduled special election. No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.

This provision allows an ordinance initiative petition to be submitted to electors in an initiative special election-not tied to any regularly-scheduled general or special election-called for the specific purpose of submitting the ordinance initiative to the voters. Thus, commensurate with the additional burden and expense of a special election called solely for the purpose of exercising the initiative power, § 3–404(3) imposes additional requirements that must be met. For an initiative special election to take place, a petition must: (1) contain qualified signatures equal in number to at least fifteen percent of the votes cast for mayor in the last regular mayoral election; and (2) specify that a special

---

9. Under State election law, a primary election is held on the second to the last Saturday of September in every even-numbered year. HRS § 12–2 (1993). Under article II, § 8, of the Hawai'i Constitution, a general election is held on the Tuesday after the first Monday in November in all even-numbered years. Pursuant to the Charter, all Honolulu elective officers are elected by non-partisan "special elections" held in conjunction with the primary and general elections. The special election held in conjunction with the primary election is designated the "first special election" and the special election held in conjunction with the general election is designated the "second special election." *See* Charter § 13–116. A second special election is held only if, in the first special election, no candidate received a majority of the votes cast for a particular office. *Id.*

election is to be held. In addition, § 3-404(3) makes clear that no special election will be held if an election is already scheduled to be held within one hundred and eighty days of submission of the proposal. Clearly, the purpose of this final qualification is to forego the additional burden and expense of a single-purpose initiative special election if a regularly-scheduled election is imminent.

Central to the dispute in this case, § 3-404(3) also provides that, "if the clerk certified less than fifteen percent but at least ten percent," the proposed ordinance shall be placed on the next regularly-scheduled special or general election ballot. In light of the mix of standards in Charter Article III, Chapter 4, we reject Stop Rail's argument that these percentages are clear and unambiguous and plainly can mean only one thing. *In isolation*, Stop Rail's argument that the percentages in the "provided that" clause both refer to the immediately-preceding "votes cast" standard makes sense. Yet, in the context of the rest of Article III, Chapter 4, particularly § 3-402(1), as amended, this argument does not withstand scrutiny.

We *must* give effect to all parts of Chapter 4. *See, e.g., Office of Hawaiian Affairs,* 117 Hawai'i at 191, 177 P.3d at 901. Even if we agree with Stop Rail's application of the "votes cast" standard to the less-than-fifteen-percent-but-at-least-ten-percent clause, we cannot read it to implicitly override the § 3-402(1) threshold requiring that an ordinance by initiative petition be signed "by duly registered voters equal in number to *at least ten percent of the total voters registered* in the last regular mayoral election." (Emphasis added.) To do so would completely negate

the intent of the voters who approved the 1992 Charter Amendment, which we cannot do.

Indeed, it makes no sense to read § 3-404(3) to *implicitly* lower the threshold standard for the number of qualified signatures required to submit a question to the electors in a regularly-scheduled election, and nothing in the legislative history supports this interpretation. It does, however, make sense in the context of the overall statutory scheme to read § 3-404(3) to allow an initiative question that does not quite meet a more-stringent special-initiative-election standard to be submitted to the voters at the next regularly-scheduled election, if it otherwise meets the "ten percent" standard required by the Charter, which was changed from ten percent of "votes cast" to ten percent of "registered voters" in 1992.[10]

We also note the City Clerk's initial interpretation of § 3-404(3) went one step further, arguing that petitioners have three distinct and mutually-exclusive options for the election at which a proposed ordinance can be submitted: a general election, a scheduled special election, or an initiative special election. As Stop Rail opted to seek an "initiative special election," the City Clerk considered Stop Rail to be bound by what the City Clerk understood to be a prohibition against seeking a special initiative election within one hundred eighty days prior to any regularly-scheduled election in Honolulu. Thus, the City Clerk argued that, pursuant to the last sentence of § 3-404(3), the Petition was fatally defective upon its tender to the City Clerk because it was submitted as a petition for a special initiative election within one

---

**10.** We reject Stop Rail's argument that we should consider post–1992 election statistics to interpret what was the intended result of the 1992 amendments. Based on the statistics cited by Stop Rail, which can be found in the 2008 State of Hawai'i Data Book, Table 8.10–VOTES CAST FOR THE OFFICE OF MAYOR: GENERAL ELECTIONS, 1972 TO 2006, and www.honoluluelections.org/election—info—election—archives/miscellaneous, in 1996 and 2004, ten percent of the registered voters was a number greater than fifteen percent of the votes cast for mayor. However, in each of the years reported by Stop Rail that preceded the 1992 amendment, 1972, 1976, 1980, 1984, and 1988 (as well as in

1992), fifteen percent of the votes cast for mayor was a number greater than ten percent of the registered voters. Thus, in 1992, it may not have been foreseen that the ratio/percentage of actual voters to registered voters would drop to such low levels (roughly sixty-six percent in 1996 and 2004, as opposed to an average exceeding eighty percent in the earlier years reported by Stop Rail) that the ten percent standard in § 3-402(1) would be harder to meet than the fifteen percent standard in § 3-404(3). This inversion has been charactered as an "absurd result" by Stop Rail; it seems more likely that it was an unintended consequence.

hundred eighty days of a regularly-scheduled election. The Circuit Court rejected this argument in the Second Amended Order (as well as in the prior order) and ordered the City Clerk to examine and process the Petition. Although this argument is suggested as an alternative basis for affirming the Circuit Court's Judgment, the City Clerk did not file a cross-appeal challenging the Circuit Court's mandate. Thus, we need not reach the issue of whether the Circuit Court erred in requiring the City Clerk to examine and process the Petition.[11]

## V. CONCLUSION

For the foregoing reasons, the Circuit Court's September 12, 2008 Judgment is affirmed.

---

11. There is no serious question, however, about whether Stop Rail's Petition could have actually resulted in a special initiative election. Clearly, no special initiative election was possible in light of the timing of the submission of the Petition to the City Clerk, which was within less than one hundred eighty days of a regularly scheduled election. See § 3–404(3) (last sentence) ("No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.") It appears that Stop Rail's strategy was to ask for a special initiative election, even though there was no way that a special initiative election would be held in 2008, in order to take advantage of the inconsistencies and ambiguities in the signature standards.